**UNITED STATES of America, ex rel. S. PRAWER & COMPANY, Gilbert Prawer and Harvey Prawer, Plaintiffs/Relators,**

v.

**VERRILL & DANA, P. Benjamin Zuckerman, Anne M. Dufour and Amy Bierbaum, Defendants.**

**Civil No. 95–321–P–H.**

United States District Court, D. Maine.

Nov. 8, 1996.

---

See also 24 F.3d 320.

David R. Collins, Asst. U.S. Atty., Portland, ME, John A. Kolar, U.S. Department of Justice, Civil Division, Washington, D.C., for U.S.

Daniel G. Lilley, Daniel G. Lilley Law Offices, P.A., Portland, ME, Jeffrey Bennett, Melinda J. Caterine, Herbert H. Bennett & Associates, P.A., Portland, ME, for Plaintiff S. Prawer & Company.

Roger A. Putnam, Verrill & Dana, Portland, ME, Thomas N. O'Connor, Hale & Dorr, Boston, ME, James E. Kaplan, Julianne Cloutier, Jensen, Baird, Gardner & Henry, Portland, ME, for Defendants.

## ORDER ON ALL PENDING MOTIONS

HORNBY, Chief Judge.

On June 13, 1996, I ruled on a variety of pending motions in this case. At the same time, I expressed concern about the viability of one of the private relators' reverse false claims and invited written argument before proceeding. I have now received and studied the legal memoranda of the parties as well as the Government's amicus curiae filing.

### FACTS

I repeat the summary of material facts set forth in my June 13, 1996 Order:

The private relators had a $2 million line of credit relationship with Maine National Bank when it was declared insolvent in early 1991. On July 12, 1991, Fleet Bank of Maine ("Fleet") agreed with the Federal Deposit Insurance Corporation ("FDIC")

to take over the failed bank's operations and assume various assets and loans. A lengthy document entitled "Assistance Agreement" governed the relationship among the various corporate entities that were party to this complex transaction. *See* Donson Decl., Ex. 8 ("Assistance Agreement"). Under the Assistance Agreement, Fleet could require the FDIC to repurchase a non-performing "loan"— defined in Article I of the Assistance Agreement as including lines of credit— provided that it met certain conditions. *See* Assistance Agreement § 10.2. Such a transaction is called a "put" by the parties. Fleet "put" the private relators' [loan] to the FDIC on May 6, 1992. At the time, the outstanding amount drawn on the line of credit pursuant to various notes was $1.6 million.[1] The private relators maintain that Fleet made material fraudulent statements to the FDIC so that it could make the put. The FDIC accepted the put by sending Fleet a written concurrence.

The FDIC hired the defendant Verrill & Dana in late October of 1992 to be its legal counsel in a lawsuit against the private relators seeking to collect on the loan. The defendants Benjamin Zuckerman and Anne Dufour were two of the lawyers from Verrill & Dana who worked on the case. In December of 1992, the FDIC assigned a staff lawyer, the defendant Amy Bierbaum, to supervise and monitor the Verrill & Dana law firm. According to the private relators, the Verrill & Dana defendants and Bierbaum learned at some point that the original Fleet put had been improper, but nevertheless proceeded to conceal and cover up that impropriety and failed to disclose it to the FDIC. They also alleg-

edly transferred and endorsed other private relator notes to the FDIC when they realized that some of the notes in the May 1992 put had been paid earlier or had expired....

Initially the private relators filed their *qui tam* action against Fleet, Recoll Management Corp. ("Recoll"),[2] Verrill & Dana, Zuckerman, Dufour and Bierbaum. Ultimately the United States elected to pursue the lawsuit against Fleet and Recoll but not the other defendants (whom I will call the "lawyer defendants").... On September 15, 1995, I ruled, over the objection of the lawyer defendants, that the private relators could file a separate action against them. The private relators then filed and served an amended complaint naming as defendants Verrill & Dana, Zuckerman, Dufour and Bierbaum....

Order of June 13, 1996, at 2–4. The second lawsuit is the matter currently before me. I have permitted the government to file a legal memorandum supposedly as amicus curiae but in reality in support of the private relators. (Although it is not a party to the second lawsuit, the government has a substantial economic interest under the False Claims Act. *See* 31 U.S.C. § 3729(a) (1994).)

### DISCUSSION

The reverse false claim provision of the False Claims Act assigns liability to anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government...." *Id.* § 3729(a)(7). To recover on a reverse false claim, as I said in my June 13 Order, the private relators must first show such an "obligation" that the law-

---

1. The private relators seem to argue that all that was "put" on May 6, 1992, were seven notes totaling $1.6 million. As I read the Assistance Agreement, however, notes are only "credit documents." All that can be put from Fleet to the FDIC is a "loan," § 10.2(b), defined in Article I to include lines of credit. In other words, the only thing that could be put on May 6, 1992, was the lending relationship with the private relators, which would include all of their outstanding debts on the line of credit. Fleet did not have the option of picking and choosing among the notes. To be sure, there may well have been defects in the put resulting

from the previous renewal of certain notes, the financial condition of the debtor, the lack of appropriate documentation in the file or other matters that the private relators assert, but there was only one put, whether successful or defective.

2. Recoll is a wholly-owned subsidiary of Fleet Norstar Financial Group, Inc. and was organized to administer the assets pool of various bridge banks in Maine, Connecticut, Rhode Island and Massachusetts in connection with a number of bank failures.

yer defendants allegedly tried to conceal. I observed in that Order that the private relators' reverse false claim seemingly was premised on what they saw as lawyer concealment of Fleet Bank's ("Fleet") contractual obligation under section 10.2(g) of the Assistance Agreement to repay the Federal Deposit Insurance Corporation ("FDIC") for an improper put. In response to my Order, the private relators assert that their argument previously had addressed only that premise because that was the focus of the defendants' arguments to which they were responding. They now broaden the basis of their reverse false claim to include lawyer concealment of Fleet obligations to repay the FDIC that, they argue, derive from (1) a general common law contractual obligation to repay because of fraud; (2) a False Claims Act obligation to repay because of fraud; (3) a common law tort obligation to repay because of fraud; and/or (4) an obligation to repay pursuant to an implied covenant of good faith and fair dealing. I accept the assertion of the more varied premises and proceed to consider them all.

■ First, however, I reject the private relators' intimations that it is somehow improper for the court to proceed in this fashion because the defendants did not initially raise the precise arguments on which I invited briefing. So long as I give the parties proper notice of my concerns (which I did here by an extensive written Order that invited further briefing) and do not rule on disputed facts, I have the discretion, if not the obligation, to narrow the issues to move the case forward efficiently and expeditiously. Consider, for example, the provisions of Fed.R.Civ.P. 16(c)(1), (14), and (16), concerning actions the court may take at a pretrial conference.[3] *See also National Expositions, Inc. v. Crowley Maritime Corp.,* 824 F.2d 131, 133–34 (1st Cir.1987) (approving a sua sponte summary judgment against a moving party even though it was not requested).

---

3. The government does not explain why as amicus curiae it should take a position that the matter is inappropriate for resolution on a motion for summary judgment or to dismiss. Amicus Curiae Br. at 12. That is more consistent with the reality of its economic stake.

4. Section 10.2(e) reads as follows:

## REVERSE FALSE CLAIM AGAINST LAWYER DEFENDANTS BASED UPON FDIC CLAIMS UNDER SPECIFIC CONTRACTUAL PROVISIONS OF THE ASSISTANCE AGREEMENT

■ I conclude that the provisions of the Assistance Agreement did not create a specific contractual "obligation to pay or transmit money" on Fleet's part that survived the FDIC's concurrence in Fleet's put of the Prawer loan. The private relators' premise for arguing that such an obligation existed is section 10.2(g) of the Assistance Agreement. Section 10.2(g) provides:

> In the event that the [FDIC] purchases an Asset that it is not required to purchase pursuant to this Section 10.2, [Fleet] shall repurchase such Asset from the [FDIC] at the Transfer Value that the [FDIC] paid [Fleet], *plus* (v) interest at the rate of the Cost of Carry plus 50 basis points, (w) advances made while the Asset was in the Pool, and (x) expenses incurred on the Asset while it was in the Pool, but *less* (y) Related Liabilities, and (z) Collections. [Fleet] shall also reassume Related [L]iabilities related to such Asset, if any, previously assumed by the [FDIC].

The private relators maintain that, in paying for Fleet's May 1992 put, the FDIC purchased an asset that it was "not required to purchase" under section 10.2 because of certain defects in the put. As a result, they say, under section 10.2(g), a Fleet obligation to repurchase and repay automatically sprang into existence and never lapsed, and the lawyers concealed it.

The private relators' reading of section 10.2(g) ignores section 10.2(e). Section 10.2(e) provides the framework for final decisions on whether a put is proper under section 10.2 and, thus, whether it can be said that it was an "asset" that, in section 10.2(g)'s terms, the FDIC was "not required to purchase pursuant to this section 10.2."[4]

> *FDIC Reply Notice.* Within sixty (60) days after the [FDIC] receives the Supporting Documentation related to a Subsequent Bank Notice listing Additional Pool Assets submitted prior to or concurrently with such Supporting Documentation, the [FDIC] will deliver to [Fleet] a written notice ("FDIC Reply Notice")

The way a "put" works under section 10.2 is as follows. Section 10.2(c) permits Fleet initially to make a put by sending the FDIC a "subsequent bank notice" and, to back up the put, requires Fleet to send a "loan information package" (the contents of which are defined in the Assistance Agreement and one of its exhibits, *see* Assistance Agreement at 17 & Ex. 11). The FDIC is then entitled, if it so chooses, to demand extensive further backup material: "copies of [Fleet's] Credit Files, records generated by computer or other electronic data processing records, journals of transaction history and such additional information relating to the subject matter of the Subsequent Bank Notice as the [FDIC] may request in writing" as well as "full access to all other relevant books and records." Section 10.2(c) (referred to as "Supporting Documentation"). In other words, the Assistance Agreement gives the FDIC access to whatever information it believes is necessary to evaluate Fleet's put. The FDIC then must evaluate this information and send Fleet a written "concurrence" or "non-concurrence" as to the put within 60 days after the FDIC receives the supporting documentation. Section 10.2(e). Under section 10.2(f)(2), however, the FDIC is required to pay the value of the put asset or loan (calculated under a separate provision) within 60 days of the subsequent bank notice, regardless of the date of receipt of the supporting documentation. Thus, payment easily may be due before the decision on concur-

rence or non-concurrence. Nothing in the Assistance Agreement otherwise specifies the sequence in which payment and concurrence/non-concurrence take place, and nothing says that the request for supporting documentation avoids or delays the FDIC's duty to pay.

If the FDIC provides a written *concurrence*, that action amounts to final approval of the put, according to the language of section 10.2(e). ("The [FDIC's] determination as to any loan as provided in the FDIC Reply Notice shall be conclusive and binding on the parties to this Agreement and not subject to further dispute except to the extent that [Fleet] indicates it disputes such determination. . . .") If the FDIC sends a written *non-concurrence*, then Fleet has 15 days to request review by a Review Board or the Office of the Comptroller of the Currency, depending on the nature of the controversy. If Fleet does not request such further proceedings within the 15 days, the FDIC's non-concurrence becomes final under section 10.2(e). If Fleet does seek timely review, then the review decision, once made, is final under the terms of section 10.2(e) regardless of who wins ("conclusive and binding on the parties to this Agreement and not subject to further dispute"), and indeed can be enforced in court.

All of these procedural steps obviously take time, and it appears that the payment requirement (section 10.2(f)) is not tolled dur-

---

setting forth its concurrence or non-concurrence as to whether the [FDIC] is required to repurchase each Asset specified in the Subsequent Bank Notice pursuant to Section 10.2(a) or (b), and its concurrence or non-concurrence with the estimated Transfer Value. If the [FDIC] indicates in the FDIC Reply Notice its non-concurrence with [Fleet's] determination that a Loan should be a Classified Loan, and if [Fleet] notifies the [FDIC] in writing within fifteen (15) days after [Fleet] receives such FDIC Reply Notice that [Fleet] disputes such determination by the [FDIC], the dispute will be referred to the OCC [Office of the Comptroller of the Currency] for determination pursuant to Section 11.2 in accordance with the OCC's then current written examination procedures and criteria. If the [FDIC] indicates in the FDIC Reply Notice its non-concurrence with [Fleet's] determination that a Loan satisfies the other criteria specified in Section 10.2(b) permitting [Fleet] to require the [FDIC]

to repurchase such Asset, and if [Fleet] notifies the [FDIC] in writing within fifteen (15) days after [Fleet] receives such FDIC Reply Notice that [Fleet] disputes such determination by the [FDIC], the dispute will be referred to a Review Board pursuant to Section 11.1. The [FDIC]'s determination as to any Loan as provided in the FDIC Reply Notice shall be conclusive and binding on the parties to this Agreement and not subject to further dispute except to the extent [Fleet] indicates it disputes such determination in a notice given within the period specified above. Any determination made by the OCC pursuant to Section 11.2 or by the Review Board pursuant to Section 11.3 shall be conclusive and binding on the parties to this Agreement and not subject to further dispute, and judgment may be entered on said determination in accordance with applicable arbitration law in any court having jurisdiction thereof.

ing their implementation. In other words, the Assistance Agreement ensures that payment occurs for the put without being delayed by disputes or requests for additional records—not a surprising consequence given the complex accounting demands of the Assistance Agreement. Section 10.2(g) providing for "reversals," therefore, is designed to cover instances where the FDIC pays for a put within 60 days of the subsequent bank notice, but ultimately (and subsequently) Fleet agrees to the FDIC's non-concurrence, or the review mechanism concludes that the FDIC was correct in the non-concurrence. In those circumstances, section 10.2(g) provides that the payment is reversed and also provides a formula for such items as interest and expenses.

This reading gives effect to both section 10.2(e)'s finality language and section 10.2(g)'s reversal language. The private relators' reading, on the other hand, appears to remove any finality from the section 10.2(e) process and thereby flies in the face of the plain language of section 10.2 as a whole. As I understand the private relators' argument, they contend that section 10.2(g) creates an ongoing obligation that can come into play at any time the FDIC concludes that it earlier made an incorrect decision or did not have sufficient information or was defrauded.[5] On their reasoning, section 10.2(g) would have to be available even after an arbitration decision and enforcement in court—notwithstanding section 10.2(e)'s language directly to the contrary ("conclusive and binding on the parties to this Agreement and not subject to further dispute").[6] If on the other hand, 10.2(e)'s finality language means what it says, and if 10.2(g)'s reversal language is designed only for instances where payment occurs before the finality stage of the concurrence/non-concurrence process is reached, then Fleet, although it may be liable on other bases I discuss later, would have no contractual obligation to repurchase and repay under 10.2(g) once the FDIC provided its written concurrence.[7]

---

5. Likewise, the government seeks to avoid section 10.2(e) finality even in cases of *mistake*. *See* Amicus Curiae Br. at 9–11.

6. The private relators and the government as amicus curiae also rely heavily on section 15.6 of the Assistance Agreement, which provides:

> 15.6 *Waivers*. The parties hereto may waive their respective rights, powers or privileges under this Agreement; *provided* that such waiver shall be in writing and *provided, further* that no failure or delay on the part of any party to exercise any right, power or privilege under this Agreement will operate as a waiver thereof, nor will any single or partial exercise of any right, power or privilege under this Agreement or the Related Agreements preclude any other or further exercise thereof or the exercise of any other right, power or privilege by such party under the terms hereof, nor will any such waiver operate or be construed as a future waiver of such right, power or privilege. No payment of any amount under this Agreement shall be construed as a waiver of any right, remedy, or power of the FDIC, either in its corporate capacity or as Bridge Bank Receiver, to question, review, or audit the item for which such payments were made or to recapture payments determined to have been erroneously made.

This section does not advance their argument at all. First, it deals with the waiver of rights "under this Agreement." The issue I am addressing is specifically what rights the Agreement gives the parties, not whether they have waived them. Second, even if waiver were at stake, the final provision of section 15.6 specifying that "payment" is not to be "construed as a waiver" is quite consistent with my interpretation of the provisions of section 10. Specifically, section 10 does provide for payment without any effect on the FDIC's rights *unless and until* the FDIC issues a written concurrence in the put or there is a final determination by the appropriate agency that the put is proper. Thus, it is not payment that results in a waiver under section 10, but concurrence or an agency determination that declares finally and conclusively that the put is proper. I reject the argument that the Assistance Agreement's contractual provisions on finality are somehow ultra vires as construed. The government's apparent concern that under this interpretation of the Agreement the FDIC is improperly waiving rights to recover for fraud, whereas only the Attorney General should have such a right, is specious. The government can still sue Fleet and Recoll for fraud; all I have ruled is that there was no pre-existing obligation to pay that would generate a reverse false claim against the lawyer defendants.

7. The private relators also suggest that section 10.3 somehow creates an obligation to pay because three later Prawer notes were "related loans" that Fleet failed to identify within 60 days of the put, thereby triggering section 10.2(g). *See* § 10.3(a)(v). Section 10.3 deals with related loans and undiscovered assets. For the reasons I have given above, *see supra* note 1, these notes are credit documents evidencing the loan be-

The private relators go so far as to argue that section 10.2(e) is written to benefit only the FDIC and therefore cannot be used to defend a Fleet position on finality. Nothing in the language supports such a construction (the language is exactly contrary—the FDIC determination is binding on the "part*ies* to the agreement") and, indeed, it would make useless the "concurrence" part of the process.[8] The private relators and the Government also argue that section 10.2(e) finality should be denied because Fleet engaged in fraud in making the put and securing the FDIC's concurrence. If fraud is proved, the private relators/government certainly have a case for a direct False Claims Act violation by Fleet and perhaps other tort-based or contractual recovery,[9] but no contractual obligation to pay automatically springs into existence under section 10.2(g) of the Assistance Agreement.

As a result, I conclude, the plaintiffs cannot make out a reverse false claim that is based upon the specific terms of the Assistance Agreement.

### REVERSE FALSE CLAIM AGAINST LAWYER DEFENDANTS BASED UPON FDIC CLAIMS AGAINST FLEET FOR A FALSE CLAIMS ACT VIOLATION OR GENERAL COMMON LAW-BASED RECOVERY, CONTRACT OR TORT

■ I will assume for purposes of this decision that the private relators eventually can successfully prove that Fleet committed against the FDIC common law fraud (tort or contract remedies), a breach of an implied covenant of good faith and· fair dealing, and/or a direct False Claims Act violation in connection with the put. Nevertheless, I conclude, Fleet had no then current "obligation to pay or transmit money" to the FDIC within the meaning of the reverse false claim provision of the False Claims Act at the time the lawyer defendants took their challenged actions.[10]

The private relators argue that if they now standing in the shoes of the government, can prove a case against Fleet for fraud, then Fleet previously had an "obligation to pay or transmit money" to the FDIC. They cite reverse false claim legislative history that talks about a person who fraudulently attempts to defeat or reduce a claim "or potential claim by the United States against him," S.Rep. No. 345, 99th Cong., 2d Sess. 18 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5283, and that says the Senate Judiciary Committee agrees with Supreme Court dictum that the original False Claims Act "'was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government.'" S.Rep. No. 345, at 19, *reprinted in* 1986 U.S.C.C.A.N. at 5284 (quoting *United States v. Neifert–White Co.,* 390 U.S. 228, 232, 88 S.Ct. 959, 961, 19 L.Ed.2d 1061 (1968)).

■ This argument, based exclusively upon legislative history, overlooks the actual language that Congress used in enacting the reverse false claims provision in 1986—penalizing the making of a false statement to conceal or avoid an "*obligation* to pay or

---

8. As amicus curiae, the government also appears to read out of the Agreement any utility in the concurrence part of the process. It suggests that any defect in the original put permanently avoids finality. *See* Amicus Curiae Br. at 4.

tween Fleet and the private relators, not separate but "related loans." They certainly are not "undiscovered assets" and the private relators do not contend that they are. (Even if the later transferred notes were "related loans" and therefore ineligible for transfer under 10.3(a)(v) because they were untimely, 10.3(a)(v) gives the FDIC only the "option" of retransferring them from the pool to Fleet and refers to section 10.2(g) as establishing the price. There is no suggestion anywhere in the record that the FDIC has ever exercised this option, and thus no obligation to pay could have arisen.)

9. All the discussion in the private relators' and government's briefs about fraud eviscerating the FDIC's concurrence may be accurate in the context of claims against Fleet and Recoll, but is irrelevant when determining whether there was a section 10.2(g) obligation to pay for purposes of the reverse false claims against the lawyer defendants.

10. I observe that in *United States ex rel. Sequoia Orange Co. v. Oxnard Lemon Co.,* CVF–91–194 (E.D.Cal. May 4, 1994), the government argued that only a contract could support an obligation to pay. *Id.* at 19. The amicus curiae brief suggests that the government has now changed its position. *See* Amicus Curiae Br. at 6 (stating that "a cause of action for a reverse false claim does not turn upon whether or not Fleet has a present contractual obligation").

transmit money" (emphasis added). In the abstract, an obligation can be legal, moral or social.[11] But "obligation" was not a new term in the False Claims Act. The same term had been used in the original post-Civil War enactment in what is now subsection 6, which prohibits the acceptance of government property "as a pledge of an obligation or debt." *See* 31 U.S.C. § 3729(a)(6) (originally enacted as "in pledge for any obligation or indebtedness" in Act of Mar. 2, 1863, ch. 67, 12 Stat. 696).[12] That context—a pledge of an obligation—makes clear that "obligation" in the False Claims Act refers to something more than potential liability or

moral or social duty; a legal obligation seems to be the touchstone. I may negligently cause damage to another in a car accident, but morality aside, I have no tort-based obligation to pay or transmit money to her until she obtains a judgment. I may breach a contract, but absent a specific remedy provided in the contract, I have no obligation to pay or transmit money to the other contracting party until he obtains a judgment. I may even violate the False Claims Act, but until the government or private relators obtain judgment, I have no obligation to pay or transmit money.[13] Congressional choice of a

**11.** Outside the False Claims Act usage, the parties have not cited and my own research has not revealed any consistent definition of the term "obligation" that would help the analysis. Almost contemporaneously to the original False Claims Act, the 1865 edition of *Webster's* defines the term as follows:
    1. The act of obligating or binding.
    2. That which obligates: the binding power of a vow, promise, oath, or contract, or of law, civil, political, or moral, independent of a promise; that which constitutes a legal or moral duty....
    3. Especially, any act by which a person becomes bound to do something to or for another, or to forbear something: external duties imposed by law, promise, or contract, by the relations of society, by civility, courtesy, kindness, and the like....
*An American Dictionary of the English Language* 901 (1865). Modern definitions are not very different, however. *See Black's Law Dictionary* 968 (5th ed. 1990) (defining "obligation" as "[t]hat which a person is bound to do or forbear; any duty imposed by law, promise, contract, relations of society, courtesy, kindness, etc."). These definitions make clear that the word "obligation" can be used in a variety of contexts meaning legal, moral or other kind of obligation. *See id.* (noting that the definition of obligation is varied and often context-dependent). Caselaw is equally varied. In 1895, the United States Supreme Court quoted language from Lord Bramwell suggesting a narrow definition: " 'How can it be said that there is a legal obligation on the part of a man to pay a debt who has a right to say, "I owe none, and no judgment has established against me that I do?" I cannot see.' " *Hilton v. Guyot*, 159 U.S. 113, 202, 16 S.Ct. 139, 158, 40 L.Ed. 95 (1895). The term also seems to be defined narrowly in the bankruptcy context, *see In re R.H. Macy & Co., Inc.*, 152 B.R. 869, 872–73 (S.D.N.Y.Bankr.1993), and in the insurance context, *see Safeway Moving & Storage Corp. v. Aetna Ins. Co.*, 317 F.Supp. 238, 244 (E.D.Va. 1970). *But see Telegraph Sav. & Loan Ass'n v. Federal Sav. & Loan Ins. Corp.*, 564 F.Supp. 880, 886 (N.D.Ill.1982) (using a broader definition in

FSLIC insolvency context). For a discussion of the term in the accounting context, *see* Financial Accounting Standards Board, "Statement of Financial Accounting Concepts No. 6" (Dec.1985), at 1120–21, 1149–51.

**12.** One commentator reports that there are no reported cases under subsection 6. *See* John T. Boese, *Civil False Claims and Qui Tam Actions*, at 2–28 (Supp.1995).

**13.** This is to be distinguished from the situation in income tax cases that the legislative history discusses, *see* S.Rep. No. 345, at 18 *reprinted in* 1986 U.S.C.C.A.N. at 5283, where there is a legal obligation to pay the tax due, and thus the filing of a fraudulent return falsely lowering or avoiding that amount is an avoidance of an obligation to pay. The same is true for the contractual rent obligations in the case of *Smith v. United States*, 287 F.2d 299, 304 (5th Cir.1961), as the Judiciary Committee discusses, *see* S.Rep. No. 345, at 18–19, *reprinted in* 1986 U.S.C.C.A.N., at 5283–84, and perhaps for government checks made out to the wrong person or for a mistakenly high amount. *See* Boese, *supra*, at 2–40.

  The private relators cite two unreported District Court decisions in support of their broad interpretation of the phrase "obligation to pay or transmit" in a reverse false claim. In *Sequoia Orange*, CVF–91–194 at 25–27, the court found an obligation satisfying the reverse false claim provision with respect to forfeitures and fines due on the part of someone who exceeded a quota or allotment in connection with shipping fruit. Under the statute, the forfeiture was established as the market value of the fruit and, according to the court, together with the fines, thereby established a "fixed amount of damages recoverable by the Government...." In *United States ex rel. Stevens v. McGinnis, Inc.*, 1994 WL 799421, at *5 (S.D.Ohio Oct. 26, 1994), the court relied on *Sequoia Orange* to conclude that violations of reporting requirements under the Clean Water Act gave rise to an obligation to pay that could be subject to a reverse false claim. In a later case not cited by the parties, the same court

term with some such certainty in scope is logical, for reverse false claims liability can result from avoiding or concealing an obligation even by "reckless disregard"; "no proof of specific intent to defraud is required." *Id.* § 3729(b).[14] In fact, the legislative history twice refers to "money owed," S.Rep. No. 345, at 15, 18, *reprinted in* 1986 U.S.C.C.A.N., at 5280, 5283, as the kind of obligation that the reverse false claims prohibition is designed to cover.[15] Money is not "owed" without a specific contract remedy, a judgment or an acknowledgment of indebtedness.

Fleet had no such obligation to pay at the time the lawyer defendants acted. As a result, I conclude that the private relators may not recover against the lawyer defendants on their reverse false claim concerning the allegedly improper put. This is so regardless of whether the matter is treated as a motion to dismiss or for summary judgment. *See* Fed.R.Civ.P. 12(b).

Accordingly, the lawyer defendants' motion to dismiss or for summary judgment on the reverse false claim concerning the put is GRANTED.

### C & S OBLIGATION

In my June 13, 1996 Order, I pointed out that in the flurry of filings no reference had been made to the assertion in the Complaint that the private relators had a reverse false claim against the Verrill & Dana defendants for having allegedly used a false record or statement to conceal, avoid or decrease a C & S obligation under the Maine Bulk Sales Act to pay the FDIC. Order of June 13, 1996, at 14 n. 8. I directed the parties to "address the status of this last claim in their memoranda." *Id.* at 20. This request for a report on the "status" of the claim (I was uncertain whether it was being pressed or waived) has led to the generation of many pages shedding more heat than light on the issue. The first question appears to be whether there was an obligation under the Maine Bulk Sales Act, 11 M.R.S.A. § 6–105 (1964) (repealed by Laws of 1991, ch. 636, effective June 30, 1992), (the FDIC first brought and then discontinued a lawsuit against C & S on the subject), but I conclude that the present record is not conducive to a ruling on the issue and must await a properly framed motion or trial.

### OTHER MATTERS

In light of my ruling that the reverse false claim on the put will not proceed, the issues in common between this action and Civil No. 93–165–P–H are greatly reduced if not eliminated. In Civil No. 93–165–P–H, the govern-

---

followed *McGinnis* to conclude that a violation (Clean Water Act) that is capable of generating a government right to recovery under a statute, thereby creates an "obligation to pay or transmit money" that can be covered up by a false record so far as the reverse false claim provision is concerned. *Pickens v. Kanawha River Towing*, 916 F.Supp. 702, 708–09 (S.D.Ohio 1996). None of these decisions discussed why violations gave rise to an immediate "obligation" prior to any judgment except the general recitation of the legislative history to which I have already referred. The *Sequoia Orange* case is perhaps closer to the tax and lease cases where there was a fixed remedy that could be construed as an obligation. *See Sequoia Orange*, CVF–91–194 at 21–22 (analogizing its facts to the tax and lease cases). Otherwise, however, there appears to be no way to define the scope of such cases, which would seem to be as broad as any lawyer's creative impulses in defining a possible claim in the first place.

14. One commentator has suggested the following hypothetical for how far false claims liability might otherwise extend:

> [I]magin[e] a motorist who, stopped for speeding in a Federal park, blurts out, "But officer, I was only doing the speed limit!" Assuming *the motorist's statement to be false*, this attempt to avoid a seventy-five dollar speeding ticket, payment of which the United States is entitled, could generate liability for a $10,000 penalty under the False Claims Act.

Boese, *supra*, at 2–30. (Treble damages are available in addition to the $10,000 civil penalty. 31 U.S.C. § 3729(a).)

15. The legislative history indicates that the House of Representatives similarly envisioned a more specific scope for the reverse false claim. In interpreting the House bill, which contained subsection 7 language identical to the eventually-enacted Senate bill, the House reported that the effect of the reverse false claim provision is to "allow[] the Government to prosecute a false claim *which has been filed for the purpose of reducing the amount the claimant owes to the Government*." H.R.Rep. No. 660, 99th Cong., 2d Sess. 20 (1986) (emphasis added).

ment is suing Fleet and Recoll for a false claim, namely the put. What remains in this action are the private relators' claims against Verrill & Dana, P. Benjamin Zuckerman and Anne M. Dufour for improper legal billings based on a conflict of interest (both a direct and reverse false claim) and the reverse false claim against the same defendants based upon the alleged C & S violation of the Maine Bulk Sales Act. Accordingly, the motion to consolidate is now DENIED.

The Clerk's Office shall schedule each of these matters separately for a discovery management conference. Each shall be considered to be a complex case within the meaning of Local Rule 17(c). In particular, the parties are directed to the requirements of Local Rule 17(c)(2), (3) and (4). In accordance with previous orders, each of these conferences shall be scheduled before me, and the Clerk's Office shall arrange for the presence of a court reporter.

SO ORDERED.