United States Court of Appeals
FOR THE EIGHTH CIRCUIT

_____

No. 96-3456
_____

United States of America,          *
                                   *
          Appellant,               *
                                   *
     v.                            *    Appeals from the United States
                                   *    District Court for the District
Q International Courier, Inc., sued as   *    of Minnesota.
Quick International Courier, Inc.;  *
Robert Mitzman; Dominique Brown;   *
Vincent Farella; Precision Mailers, *
Inc; and Gregg Smith,              *
                                   *
          Appellees.

_____

No. 96-3590
_____

Q International Courier, Inc.,     *
                                   *
          Counter-Appellant,       *
                                   *
     v.                            *
                                   *
United States Postal Service,      *
                                   *
          Counter-Appellee.

_____

Submitted: October 22, 1997

Filed: December 22, 1997

_____

Before FAGG, WOLLMAN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Q International Courier ("Quick") is a mail courier firm that arranges for the delivery of large numbers of letters. Robert Mitzman, Dominique Brown, and Vincent Farella were officers or employees of Quick at the time of the disputed activities. According to the government's complaint, Precision Mailers was a corporation engaged in the business of coordinating and brokering mail promotions. The district court noted, however, that Precision Mailers is no longer involved directly in this litigation because it is both insolvent and inactive. Gregg Smith was an officer or employee of Precision Mailers at the time of the disputed activities; although he remains a nominal party to this case, the United States has apparently settled its dispute with him.

At issue in this case is a practice known as "ABA remail." To take advantage of differences between domestic and certain international postage rates, Quick would transfer bulk mail from the United States (A) to Barbados (B) for the purpose of remailing the letters individually back into the United States (A). At the time of the incidents in question here, the United States Postal Service rate for domestic mail was 29¢ per ounce, but the record suggests that the Postal Service charged the Barbadian postal service as little as one-tenth of that amount for the same first-class delivery of mail throughout the United States. Accordingly, the Barbadian postal service charged a sum significantly less than 29¢ per ounce to deliver mail from Barbados to the United

-2-

States.  By taking the letters to Barbados and mailing them back into the United States, Quick therefore achieved significant postage cost savings for its customers.

The United States, on behalf of the Postal Service, sued Quick and the other defendants on the grounds that the courier had violated the reverse claims provision of the False Claims Act, *see* 31 U.S.C. § 3729(a)(7).  The government asserted that the defendants owed an obligation to the United States for the full domestic postage for each letter and that they attempted to reduce this obligation through fraudulent statements or records.  For its part, Quick counterclaimed against the Postal Service, alleging unfair competition in violation of the Lanham Act, *see* 15 U.S.C. § 1125(a), on the grounds that the Postal Service had provided false or misleading information to a trade publication regarding this dispute.  The district court held on summary judgment that the United States had not established that Quick had an obligation to pay postage within the meaning of the False Claims Act.  We agree.  The district court also held on summary judgment that the doctrine of sovereign immunity barred a suit against the Postal Service based on the Lanham Act.  We disagree, vacate that ruling by the district court, and remand for further proceedings consistent with this opinion.

## I.

The principal action in this case was brought by the United States to recover under the so-called reverse false claims provision of the False Claims Act, *see* 31 U.S.C. § 3729(a)(7).  That provision gives the United States a means to recover from someone who makes a material misrepresentation to avoid paying some obligation owed to the government.  *See* S. Rep. No. 99-345, at 15, 18 (1986), *reprinted in* 1986 *U.S.C.C.A.N.* 5266, 5280, 5283.  The statute provides for a civil penalty and treble damages for using a false statement "to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  *See* 31 U.S.C. § 3729(a)(7).

The district court found that the United States failed to demonstrate that Quick or the other defendants owed any obligation to the government, and accordingly entered

summary judgment for Quick on the claim against it. We agree. Whether the ABA remailing practice engaged in by Quick constitutes a violation of some other law is a question for another day, but we believe that in this case the United States has not demonstrated that any of the defendants owed an "obligation" to the government within the meaning of the False Claims Act.

To recover under the False Claims Act, we believe that the United States must demonstrate that it was owed a specific, legal obligation at the time that the alleged false record or statement was made, used, or caused to be made or used. The obligation cannot be merely a potential liability: instead, in order to be subject to the penalties of the False Claims Act, a defendant must have had a present duty to pay money or property that was created by a statute, regulation, contract, judgment, or acknowledgment of indebtedness. The duty, in other words, must have been an obligation in the nature of those that gave rise to actions of debt at common law for money or things owed. This interpretation of the term "obligation" is supported by the legislative history of the reverse false claims provision, which refers twice to "money owed," S. Rep. No. 99-345, at 15, 18, *reprinted in* 1986 *U.S.C.C.A.N.*, at 5280, 5283, as the kind of duty that the reverse claims provision is designed to address. The deliberate use of the certain, indicative, past tense suggests that Congress intended the reverse false claims provision to apply only to existing legal duties to pay or deliver property. Had Congress wished to cover attempts to avoid potential fines or sanctions it would have used language appropriate to that end. *Cf. United States ex rel. S. Prawer & Co. v. Verrill & Dana*, 946 F. Supp. 87, 93-95 (D. Me. 1996).

To prevail in its false claims action against these defendants, then, the United States must demonstrate that there was an existing, specific legal duty in the nature of a debt that Quick or the other defendants owed the United States at the time of their ABA remailing activities. The government does not allege any contract with the defendants, nor does it claim to be the beneficiary of any judgment or acknowledgment of indebtedness. Instead, it relies upon various statutes and regulations to establish that

the defendants owed a duty to pay full domestic postage as to each piece of mail sent through Barbados. We are satisfied as a legal matter that such a duty would qualify as an "obligation" under the False Claims Act. As we shall demonstrate, however, the statutes and regulations that the United States cites might well support a judgment that one or more of the defendants engaged in illegal and fraudulent activity, but those statutes and regulations do not create a legal duty for the defendants to pay domestic postage.

The United States first points to the Postal Service's International Mail Manual §§ 790-793 (June 9, 1997) ("IMM") as the source of the obligation to pay domestic postage to the Postal Service for each piece of mail sent through Barbados. The most relevant of these sections informs the reader that payment of domestic postage "is required to secure delivery of mail" sent by or on behalf of a resident of the United States, if the foreign postage applied to the mail is lower than the comparable United States domestic postage rate. *See* IMM § 791. By its terms, however, this provision states only that the Postal Service is not obligated to deliver mail sent by United States residents from certain foreign locations. Its plain language serves only to release the Postal Service from an obligation, not to impose an obligation on anyone to pay postage.

Indeed, to read IMM § 791 as creating an obligation to pay postage would be inconsistent with the authority pursuant to which it was promulgated. The United States argues that IMM §§ 790-793 are authorized by the Universal Postal Convention, art. 23; but that article simply provides that a signatory "shall not be bound to forward or deliver" mail sent by or on behalf of a resident of the signatory country from another country if the foreign postage rate is lower than the signatory country's domestic rate. *See* Universal Postal Convention, art. 23, ¶ 1 (1984), *reprinted in* 2 *Acts of the Universal Postal Union* 37 (1985). The aim of the article is to release the Postal Service from an obligation to deliver mail, not to establish an obligation for others to pay full domestic postage.

-5-

The United States turns next to the Private Express Statutes, *see* 39 U.S.C. §§ 601-606, in an effort to locate a legal duty on Quick's part to pay postage. These provisions, and their enabling regulations, *see* 39 C.F.R. § 310.1 through § 310.7, protect the Postal Service's monopoly by forbidding the private carriage of letters. By transporting letters to Barbados by a means other than the Postal Service, Quick perhaps violated the Private Express Statutes. Nonetheless, this violation is relevant to liability under the False Claims Act only if the Private Express Statutes impose a legal duty on Quick to pay postage, and we believe that they do not. The Private Express Statutes themselves merely prohibit the carriage of letters outside the mails and the carriage of letters by a vessel departing the United States if those letters are not either deposited by the Postal Service or pertaining to the cargo of the vessel. *See* 39 U.S.C. §§ 601-602.

It is true that the regulations implementing the Private Express Statutes provide that the Postal Service may seek payment of a penalty in "an amount or amounts not exceeding the total postage" from someone who violates the Private Express Statutes. *See* 39 C.F.R. § 310.5(a). But this regulation does not oblige the violator to pay the postage that might have been collected by the Postal Service; it merely sets the limit of a potential penalty against the violator at the amount of postage that might have been collected. A potential penalty, on its own, does not create a common-law debt. A debt, and thus an obligation under the meaning of the False Claims Act, must be for a fixed sum that is immediately due. This regulation merely provides a range of penalties that might be assessed; it does not create an immediate duty to pay a specific sum.

The criminal penalties for violating the Private Express Statutes also do not impose a duty to pay postage. Anyone who carries letters outside the mails may be fined, but the fine is not necessarily related to the amount of postage avoided or evaded. *See* 18 U.S.C. §§ 1694-1697. Anyone who establishes a private express for conveying letters over postal routes can be fined and imprisoned. *See* 18 U.S.C. § 1696(a). But, again, the fine is unrelated to the postage due. During the period in

-6-

question here, 18 U.S.C. § 1696(a) authorized a fine of not more than $500 and up to six months in jail for establishing a private express. In any case, the statutes are designed to punish one who violates the Private Express Statutes, not to create an obligation to pay postage.

Nor can an obligation to pay postage be located in the regulatory suspension of the Private Express Statutes. The Postal Service may suspend the Private Express Statutes where required by the public interest, *see* 39 U.S.C. § 601(b), and it has chosen to do so for mail collected in the United States, transferred to another country, and mailed from that second country to a location outside the United States ("ABC remail"). *See* 39 C.F.R. § 320.8(a). This suspension, by its own terms, does not apply to ABA remail. *See* 39 C.F.R. § 320.8(b). It does not make ABA remail illegal, nor does it impose any new prohibition or duty relating to ABA remail beyond that already imposed by the Private Express Statutes.

The Postal Service argues, finally, that Quick owes postage because ABA remail is actually domestic mail rather than international mail. Even if ABA remail were considered domestic, a question that we need not reach, the government has failed to establish a duty for Quick to pay postage in the circumstances presented in this case. The United States does not point us to any source imposing a duty on Quick's part to pay postage on any mail other than those already rejected above.

In order to recover under the reverse claims provision of the False Claims Act, the United States must demonstrate that Quick had some duty to the government to pay money or property that it sought to evade by using false statements or records. The government has failed to establish that such a duty existed here. We therefore affirm the district court's grant of summary judgment to the defendants with respect to the False Claims Act.

II.

As a counterclaim to the Postal Service's suit against Quick under the False Claims Act, Quick, as we have said, sued the Postal Service alleging unfair competition in violation of the Lanham Act, *see* 15 U.S.C. § 1125(a). The Postal Service moved for summary judgment on the grounds that it was protected from suit under the doctrine of sovereign immunity, and the district court granted the motion.

Prior to the Postal Reorganization Act, the Postal Service operated as a department of the United States government, and was thus protected from suit under the doctrine of sovereign immunity except as otherwise provided by law. In 1971, however, the Postal Service was transformed from a department of the United States into an "independent establishment of the executive branch." *See* 39 U.S.C. § 201. More important for present purposes, Congress at that time authorized the Postal Service to "sue and be sued in its official name." *See* 39 U.S.C. § 401(1). That language operates to waive the government's traditional sovereign immunity to suit. *Loeffler v. Frank*, 486 U.S. 549, 556 (1988). This waiver "must be liberally construed and ... the Postal Service's liability must be presumed to be the same as that of any other business." *Id.*

The Postal Reorganization Act also provided, however, that the provisions of 28 U.S.C. relating to tort claims (which include the Federal Tort Claims Act) "shall apply to tort claims arising out of activities of the Postal Service." *See* 39 U.S.C. § 409(c). The Postal Service argues that this section contracts the general waiver of immunity provided by § 401(1) and that it can be sued in tort only pursuant to the Federal Tort Claims Act. Since, the argument runs, the Federal Tort Claims Act deals solely with actions against the government brought under state law, the Postal Service contends that it is immune to suit under the Lanham Act.

We disagree. A more logical reading of 39 U.S.C. § 409(c) is that the Federal Tort Claims Act provides the only remedy against the Postal Service for torts to which

the Federal Tort Claims Act by its terms applies in the first place. Nothing in § 409(c) suggests that it intended to forbid recovery against the Postal Service for tort claims that are beyond the reach of the Federal Tort Claims Act. It would be strange if Congress had resolved to give with one hand and then take away with the other. Our construction of the statute gives effect to both § 401(1) and § 409(c) in a way that we think makes more internal sense than the Postal Service's proposed reading. *Cf. FDIC v. Meyer*, 510 U.S. 471, 480-83 (1994).

Finally, the Postal Service argues that, as an entity of the federal government, it is immune from a Lanham Act claim under our holding in *Preferred Risk Mutual Insurance Co. v. United States*, 86 F.3d 789 (8th Cir. 1996), *cert. denied*, 117 S. Ct. 1245 (1997). We held there that the Lanham Act does not, on its own or in conjunction with the Administrative Procedure Act, provide an express waiver of the federal government's traditional sovereign immunity. *Id.* at 795. Unlike the federal entity at issue in *Preferred Risk*, however, the Postal Service is outfitted with a sue-and-be-sued clause waiving its traditional sovereign immunity. Quick does not -- and could not under *Preferred Risk* -- rely upon the Lanham Act to waive the Postal Service's sovereign immunity. As we have discussed above, however, that immunity is properly waived for these purposes under 39 U.S.C. § 401(1). We therefore vacate the district court's grant of summary judgment to the Postal Service with respect to the Lanham Act counterclaim.

## III.

For the foregoing reasons we affirm the trial court's summary judgment as to the False Claims Act, vacate its summary judgment as to the Lanham Act counterclaim, and remand for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.