[PUBLISH]

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE ELEVENTH CIRCUIT**

No. 97-6910

D.C. Docket No. 97-P-1300-S

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
02/08/99
THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

                                    Plaintiff-Appellant,

    versus

PEMCO AEROPLEX, INC., a subsidiary of
Precision Standard Company, a corporation,

                                    Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Alabama

(February 8, 1999)

Before HATCHETT, Chief Judge, HULL, Circuit Judge, and MOORE[*], District Judge.

HATCHETT, Chief Judge:

---

[*] Honorable William T. Moore, Jr., U.S. District Judge for the Southern District of Georgia, sitting by designation.

Appellant United States (government) challenges the district court's dismissal of its False Claims Act lawsuit and state common law claims against appellee Pemco Aeroplex, Inc. (Pemco) for failing to state a claim. We affirm.

## I. BACKGROUND

Since the 1960s, Pemco and its predecessor, Hayes International Corporation, have contracted to perform high-level maintenance of C-130 aircraft for the United States Air Force (Air Force). Pemco's contracted performance included assembling new model wings and replacing older model wings on C-130s. As a result of their contract, Pemco had on its premises both older and newer model wings.

In 1991 Pemco had on its premises five C-130 wings that belonged to the government that it did not need to perform its contract. Pemco decided to initiate a "Plant Clearance Procedure" so that it could receive instructions from the Air Force concerning the disposition of the five wings. The Federal Acquisition Regulations define the plant clearance procedure as "all actions relating to the screening, redistribution, and disposal of contractor inventory from a contractor's plant or work site." 48 C.F.R. § 45.601 (1997). Under this procedure, a government contractor submits a form advising the government that it is holding certain government property in excess of its government contract. The government may then "exercise its rights to require delivery of any contractor inventory," or dispose of the property through: (1) allowing the contractor to purchase the property at cost; (2) returning the property to the suppliers; (3) donating the property to "eligible donees"; (4) selling the property, "including purchase or retention at less than cost by the prime contractor"; (5) donating the property to public bodies; or (6) abandoning or destroying the property. See 48 C.F.R. 45.603.

2

Pursuant to the plant clearance procedure, Pemco submitted a "Standard Form 1428, Inventory Schedule B" (inventory schedule) on May 28, 1991, that notified the Air Force that it held five C-130 wings (three right-side wings and two left-side wings), and described the wings, referencing them with two national stock numbers.[1] The government uses national stock numbers to identify precisely items within its inventory system. Pemco used national stock numbers that identified older model wings in the inventory schedule it submitted for plant clearance, and offered to purchase the wings as scrap -- estimating their value as $1,125 for the three right-side wings and $750 for the two left-side wings.[2]

The government agreed to sell the five wings to Pemco for their scrap value of $1,875 listed in the inventory schedule. Pemco, however, had wrongfully identified the wings' national stock numbers. The wings it purchased from the government were actually newer-model wings and worth much more than the scrap value Pemco had listed in the inventory schedule. Shortly after purchasing the wings from the government, Pemco sold two of the wings for approximately $1,500,000. The government estimates the total market value of the wings to be at least $2,071,526.25.

The government thereafter sued Pemco in the United States District Court for the Northern District of Alabama, alleging that Pemco had violated the False Claims Act, 31 U.S.C. §§ 3729-3733, and also alleging state common law counts of mistake of fact and unjust

---

[1] The Federal Acquisition Regulations require the use of Standard Form 1428, Inventory Schedule B in 48 C.F.R. section 45.606-5(a)(2).

[2] The government asserts in its complaint that the type of older wings that Pemco referenced in its inventory schedule and corresponding national stock number were "routinely disposed of as scrap."

3

enrichment. With regard to the False Claims Act, the government contended that Pemco "knowingly made, used, or caused to be made or used, false statements or actions for the purpose of obtaining property from the United States," "knowingly presented, or caused to be presented, to an officer or employee of the United States Government a false or fraudulent claim for approval" and "knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government." The district court granted Pemco's motion to dismiss, holding that: (1) the dismissal was with prejudice as to the government's claim regarding a false claim under the False Claims Act because the government did not allege that Pemco submitted documents that constituted a false "claim"; and (2) the dismissal was without prejudice as to the government's ability to refile a False Claims Act complaint that contained the particularity requirement for intent to defraud under Federal Rule of Civil Procedure 9(b).

## II. ISSUE

The issue we decide is whether the district court erred in dismissing the government's "reverse false claim" under the False Claims Act, 31 U.S.C. § 3729(a)(7).

## III. STANDARD OF REVIEW

We review de novo a dismissal for failure to state a claim, and apply the same standard as did the district court. Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1387 (11th Cir. 1998), cert. denied, 67 U.S.L.W. 3106 (U.S. Nov. 16, 1998) (No. 98-200). We must accept the allegations set forth in the complaint as true for purposes of a motion to dismiss. See Gonzalez v. McNary, 980 F.2d 1418, 1419 (11th Cir. 1993). The district courts should grant motions to dismiss only "when the movant demonstrates 'beyond doubt that the plaintiff can

4

prove no set of facts in support of his claim which would entitle him to relief.'" Harper, 139 F.3d at 1387 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). Additionally, because the district court's disposition of Pemco's motion to dismiss involved interpretation of the False Claims Act, we must review de novo questions of statutory interpretation. Gonzalez, 980 F.2d at 1419.

## IV. DISCUSSION

In this appeal, the government contends that the district court erred in dismissing its "reverse false claim" under the False Claims Act. 31 U.S.C. § 3729(a)(7). That provision provides that any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government" is liable to the government "for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . ." 31 U.S.C. § 3729. The government argues that Pemco caused the government to sell the wings at a price below true value because Pemco knowingly misidentified the wings on the inventory schedule. Thus, the government contends that Pemco submitted a "reverse false claim" and violated section 3729(a)(7).

This court has not had the opportunity to construe the reverse false claim provision of the False Claims Act. The Eighth Circuit in United States v. Q Int'l Courier, Inc. analyzed the reverse false claim provision of section 3729(a)(7) in the context of an illegal international "ABA remail" scheme. 131 F.3d 770 (8th Cir. 1997). Essentially, Q International Courier (Quick) transferred bulk mail from the United States to Barbados for the purposes of remailing the letters individually back into the United States. The United States Postal Service charged the

5

Barbadian Postal Service significantly less for the delivery to the United States than it would for the same delivery within the United States. See Q Int'l Courier, 131 F.3d at 772. The government contended that Quick violated the reverse false claim provision of section 3729(a)(7), asserting that Quick "owed an obligation to the United States for the full domestic postage for each letter and that they attempted to reduce this obligation through fraudulent statements or records." Q Int'l Courier, 131 F.3d at 772. The Eighth Circuit held that the government failed to establish that Quick "had some duty to pay money or property that it sought to evade by using false statements or records" and affirmed the district court's grant of summary judgment in favor of Quick on the government's False Claims Act allegations. See Q Int'l Courier, 131 F.3d at 774.

We find the Eighth Circuit's analysis of the reverse false claims provision to be persuasive. The Q Int'l Courier court construed the plain language of the False Claims Act, as well as its legislative history, and held that in order to recover under the reverse false claims provision, the government "must demonstrate that it was owed a specific, legal obligation at the time that the alleged false record or statement was made, used, or caused to be made or used." Q Int'l Courier, 131 F.3d at 773. Further, the Q Int'l Courier court held that this obligation could not be "merely a potential liability," but instead

> a defendant must have had a present duty to pay money or property that was created by a statute, regulation, contract, judgment, or acknowledgment of indebtedness. The duty, in other words, must have been an obligation in the nature of those that gave rise to actions of debt at common law for money or things owed.

Q Int'l Courier, 131 F.3d at 773; see also United States ex rel. S. Prawer & Co. v. Verrill & Dana, 946 F. Supp. 87, 94 (D. Me. 1996) ("'obligation' in the False Claims Act refers to

something more than potential liability or moral or social duty; a legal obligation seems to be the touchstone.").

The reverse false claim's legislative history further persuades us of this specific obligation requirement. As the Q Int'l Courier court noted, the legislative history twice refers to "money owed" under the false claims provision as the type of duty that the reverse claims provision addresses. See Q Int'l Courier, 131 F.3d 773. We agree that Congress intended that the government must premise a reverse false claim upon a specific, legal obligation at the time a defendant used or caused to be used an alleged false claim. See, e.g., False Claims Amendments Act of 1986, S. Rep. No. 99-345 at 15, 18, 1986 U.S.C.C.A.N. (100 Stat. 3153) 5266, 5280, 5283 ("an individual who makes a material misrepresentation to avoid paying money owed the Government should be equally liable under the Act as if he had submitted a false claim.").

We do not find this type of obligation when we analyze the government's complaint and Pemco's filing of an inventory schedule pursuant to the plant clearance procedure. According to the Federal Acquisition Regulations, Pemco submitted the inventory schedule to the Air Force's plant clearance officer, "an authorized representative of the contracting officer assigned responsibility for plant clearance." 48 C.F.R. § 45.601; see also 48 C.F.R. § 45.606-1 ("[w]hen property is no longer needed to perform the contract, the contractor shall prepare inventory schedules in accordance with the contract and instructions from the plant clearance officer and shall promptly submit the schedules to the cognizant contract administration office."). Within 15 days of receiving the inventory schedule, the plant clearance officer reviews the schedule, determines its acceptability and requests any corrections. See 48 C.F.R. § 45.606-3(a). Then, the plant clearance officer "shall verify that (1) the inventory is present at the location indicated,

(2) the inventory is allocable to the contract, (3) the quantity and condition are correctly stated, and (4) the contractor has endeavored to divert items to other work." 48 C.F.R. § 45.606-3(b). In dealing with "scrap," the plant clearance officer "shall review the schedules of property reported as scrap and, if necessary, physically inspect the property involved. If the plant clearance officer determines that any of the property is serviceable, usable, or salvable, the contractor shall resubmit it on appropriate inventory schedules." 48 C.F.R. § 45.607-1(b). Property the government had not deemed to be "scrap" "shall be screened for use by Government agencies before disposition by donation or sale." 48 C.F.R. § 45.608-1(a). After these procedures, the plant clearance officer may then decide the proper disposition of the property, which could include selling it to the contractor or requiring delivery to the government. See 48 C.F.R. § 45.603.

Pemco's filing of the inventory schedule did not create a specific, legal obligation or a present duty to pay money, and the government's complaint does not detail any other type of reverse false claim. Although Pemco listed the scrap estimate of the wings in the "offer" column of the inventory schedule, the government could not accept this offer – or demand return of the wings – until it utilized the plant clearance procedure. See 48 C.F.R. §§ 45.600 - 45.615. Pemco's submission of the inventory schedule initiated the plant clearance procedure, and did not create the type of obligation that the reverse false claim provision of the False Claims Act requires. Additionally, the "offer" that Pemco submitted in its inventory schedule may have created a future potential liability (an offer to purchase the wings or return them after the occurrence of the plant clearance procedure), but did not create the specific legal obligation that the reverse false claim provision requires. Therefore, we hold that the district court did not err in

8

dismissing the government's lawsuit under the False Claims Act, including its allegations of Pemco's violations of the reverse false claim provision, for failing to state a claim.

## V.  CONCLUSION

Based on the foregoing, we affirm the district court's dismissal of the government's lawsuit under the False Claims Act for failing to state a claim, and do not reach the government's contentions regarding its state common law claims.

**AFFIRMED.**

HULL, Circuit Judge, dissenting:

This important case of first impression in this Circuit involves a Rule 12(b)(6) dismissal of the Government's complaint and not entry of summary judgment. I dissent because the Government's complaint clearly states a cause of action, and the district court erred in dismissing it.

The majority correctly concludes that Section 3729(a)(7) of the False Claims Act requires a specific, legal obligation to pay or to transmit money or property, at the time a false statement is made.[3] However, the majority incorrectly finds that the Government's complaint fails to allege such an obligation. The specific allegations of the complaint show why the majority errs.

The complaint alleges that Pemco performed high-level maintenance of "C-130" aircraft for the Air Force and that Pemco had on its premises both older model and newer model "C-130" wings belonging to the Government. Paragraph 8 of the complaint asserts that Pemco possessed five wings belonging to the Government that "were not needed by Pemco for performance of its contracts with the United States," and that thus Pemco initiated the Plant Clearance procedure in order to have the Government instruct Pemco regarding the return of the wings to

---

[3]Section 3729(a)(7) provides for liability if a person "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease **an obligation to pay or transmit** money or **property to the Government**." 31 U.S.C. § 3729(a)(7) (emphasis supplied).

the Air Force or other disposal.

Paragraph 9 of the complaint alleges that "[u]nder the Plant Clearance procedure, the contractor (in this case Pemco) advises the [G]overnment that the contractor is holding certain property belonging to the United States in excess to the needs of its Government contract." The complaint explains that the contractor may offer to purchase the property from the Government rather than have it returned. As alleged in paragraph 10 of the complaint, "Pemco submitted to the United States a document entitled 'Inventory Schedule B' which was part of the 'Plant Clearance' procedure mentioned above."

The complaint continues that Pemco listed five wings, described those wings by two national stock numbers, and incorrectly identified the stock numbers. According to the complaint, Pemco used stock numbers referencing older, obsolete model wings worth $1,875, or $375 each, when, in fact, the wings Pemco actually had were newer model wings with a market value of over $2,071,526. The complaint alleges that Pemco sold just two of the five wings for $1,500,000. Pemco does not deny these allegations.

I agree with the majority that Pemco's inventory schedule **alone** does not necessarily create a legal obligation to pay at the time the inventory schedule is submitted to the Air Force. But the majority errs in considering solely Pemco's

2

inventory schedule and overlooking Pemco's contract with the Government that requires Pemco either to return these wings or to purchase them. The complaint specifically alleges that Pemco submitted this inventory schedule pursuant to its contract with the Air Force and that Pemco's contract required Pemco to advise the Government about any property belonging to the Government in excess of the needs of its Government contract. Therefore, Pemco had a contractual obligation either to return (i.e., "transmit" under § 3729(a)(7)) excess property to the Government or to purchase (i.e., "pay" for under § 3729(a)(7)) excess property from the Government.[4]

The complaint has sufficient allegations to survive the granting of a motion to dismiss for failure to state a claim. The complaint alone contains express references to Pemco's contract with the Air Force, and alleges that Pemco obtained the wings "as a result of [those] contracts," and that the inventory schedule was

---

[4]Because the district court disposed of this case on a motion to dismiss, the record below is extremely bare. Therefore, the text of the dissent discusses only the allegations in the complaint. However, the Government did attach to its appellate brief the Government property clause, and portions of Pemco's contract showing incorporation of that clause in Pemco's contract with the Air Force. The contract contained provisions expressly stating (1) that the Government retained title to all Government-furnished property, (2) that the contractor (Pemco) was responsible and accountable for all Government property provided under the contract, and (3) that all such property not consumed in performing the contract was to be returned to the Government, or disposed of according to its instructions, with proceeds of any such disposal being credited to the contract price or paid directly to the Government. Add. B at 4b-6b. Since these documents were not attached to the complaint in the district court, they cannot be considered on appeal.

3

being filed because these wings exceeded Pemco's needs under its Government contract. The complaint expressly references Pemco's obligations either to return the wings to the Government or to purchase the wings from the Government and that the inventory schedule was submitted in connection with those contractual obligations.

Pemco argues that it was required to return the wings only at the end of its Government contract or at an earlier date if required by the Government's contracting officer. According to Pemco, because neither of those events had occurred, Pemco did not have an existing obligation to return or pay for the wings at the time it submitted the inventory form. In addition, Pemco argues that the submission of the inventory form was merely an offer to purchase the excess wings but did not establish either an obligation to purchase or the specific purchase price. According to Pemco, at best, this offer created only a contingent obligation to purchase – dependent on the Government's inspection of the property and acceptance of Pemco's offer.

These arguments ignore the complaint's allegations that at the time Pemco submitted the inventory form, the wings were deemed excess. Indeed, Pemco only submitted the inventory form because the wings were deemed excess and it had a pre-existing contractual obligation to submit such a form. That Pemco offered to

4

purchase the property and that a specific purchase price had not been agreed upon at the time Pemco submitted the inventory form are not the touchstone. As alleged in the complaint, Pemco had a contractual obligation to return excess Government property or to dispose of it in accordance with the Government's instructions. This legal obligation was a specific, ongoing obligation during the life of the contract and did not begin or end at any one point in time. This is the relevant obligation and submitting the inventory form was just part of fulfilling this pre-existing contractual obligation.

The majority bases its opinion on United States v. Q International Courier, Inc., 131 F.3d 770 (8th Cir. 1997). I agree with the Eighth Circuit's reasoning but Q International Courier is totally different from this case because that decision did not involve a Government contract. Q International Courier involved a mail courier firm that transferred bulk mail from the United States to Barbados in order to remail the letters individually from Barbados to the United States. Id. at 772. Through this scheme, Q International Courier ("Quick") was able to take advantage of the discounted rates the United States Postal Service charged the Barbadian postal service, achieving significant savings for its customers. Id. In contrast to this case, Quick was not a Government contractor. Id. at 772-73. Thus, any "obligation" Quick may have owed to the Government could only have

5

derived from statutes, regulations, judgments – legal sources other than a written contract.

The Eighth Circuit in <u>Q International Courier</u> explicitly noted that the Government did not have a contract with Quick, thereby suggesting that a contractual duty would qualify as an "obligation" in its opinion. <u>Id.</u> at 773. In addition, the Eighth Circuit in <u>Q International Courier</u> concluded that no obligation to pay domestic postage rates could be found in any of the statutes or regulations cited by the Government. <u>Id.</u> at 773-774.

In contrast, Pemco had a written contract which expressly obligated Pemco to be responsible and accountable for the Government property in its possession and to return that property to the Government or dispose of the property in accordance with the Government's instructions. In addition, the Government has pointed to regulations that obligate Pemco to return Government property not needed in the performance of the contract. <u>Q International Courier</u>, if anything, shows why the district court erred in dismissing the Government's complaint for failure to state a claim under Rule 12(b)(6).

Therefore, I respectfully dissent.