**AMERICAN TEXTILE MANUFAC-
TURERS INSTITUTE, INC.,
Plaintiff–Appellant,**

v.

**THE LIMITED, INC., et al.; Tarrant
Apparel Group, et al., Defendants–
Appellees.**

No. 98–3889.

United States Court of Appeals,
Sixth Circuit.

Argued: Aug. 12, 1999.

Decided and Filed: Sept. 14, 1999.

Rehearing and Suggestion for Rehearing
En Banc Denied Nov. 2, 1999.*

---

* Judges Nelson and Moore recused themselves from participation in this ruling.

Douglas N. Letter (argued and briefed), Sandra Wien Simon, Richard A. Olderman (briefed), U.S. Department of Justice, Civil Division, Appellate Staff, Washington, D.C., for Amicus Curiae.

Paul D. Cullen (argued and briefed), Diana E. Stein and Joseph Black (briefed), Cullen Law Firm, Washington, D.C., Ann Lugbill and James B. Helmer, Jr. (briefed), Helmer, Lugbill, Martins & Morgan, L.P.A., Cincinnati, Ohio, for Plaintiff–Appellant.

Michael J. Canter (briefed), James E. Phillips, Vorys, Sater, Seymour & Pease, Columbus, Ohio, John T. Boese (argued and briefed), Fried, Frank, Harris, Shriver & Jacobson, Washington, D.C., for Defendant–Appellee The Limited, Inc.

David J. Young (briefed), Squire, Sanders & Dempsey, L.L.P., Columbus, Ohio, for Defendant–Appellee Tarrant Apparel Group.

Before: KEITH, BOGGS, and CLAY, Circuit Judges.

## OPINION

BOGGS, Circuit Judge.

The American Textile Manufacturers Institute filed a qui tam action against several defendants, alleging that the defendants submitted false claims to the government to avoid payment of fines, duties, and liquidated damages for the illegal transshipment of imported textiles. A United States District Judge dismissed the complaint for failure to state a claim, but later recused himself because of his prior representation by a member of the firm representing one of the defendants. A second judge took over the case and declined to vacate, alter, or amend the prior judgment. ATMI appealed, and we affirm.

I .

In September 1996, the American Textile Manufacturers Institute ("ATMI") filed a complaint in the United States District Court for the Central District of California, naming as defendants The Limited, Inc. and several subsidiary corporations (referred to as the "Limited defendants"), Tarrant Apparel Group and a subsidiary corporation (the "Tarrant defendants"), and two California citizens, principal shareholders of the Tarrant Apparel Group. ATMI sued on behalf of the United States, claiming that the defendants violated 31 U.S.C. § 3729(a)(7), a provision of the False Claims Act. The government declined to intervene.

ATMI, the national trade association of the domestic textile industry, complained that the defendants engaged in transshipping and mislabeling of the country of origin of textile and apparel products. ATMI alleged that its investigations revealed that the defendants

> engaged in a pattern or practice of trade pursuant to which articles of apparel produced in the People's Republic of China have been transhipped to Hong Kong or Macau; have been falsely labeled as the products of Hong Kong or Macau; and have been knowingly represented to be the products of Hong Kong or Macau in official entry documents submitted to Customs by or on behalf of said Defendants.

ATMI contended that the defendants filed false entry documents "used to enter or introduce textile and apparel products into the commerce of the United States that were not entitled to admission [because of textile quotas] and were not marked with the true country of origin."

ATMI alleged that the defendants' practices exposed them to liability under the

following statutes, and that the filing of false documents concealed from the government the defendants' liability:

(1) 18 U.S.C. § 545, prohibiting the smuggling of goods into the United States, the importation of illegal goods, and the use of false customs documents.

(2) 19 U.S.C. § 1595a(b), penalizing those persons who assist in the importation of goods "contrary to law."

(3) 19 U.S.C. § 1592, penalizing the making of negligent, grossly negligent, or fraudulent material omissions or false material statements in connection with the importation of any merchandise into United States commerce.

(4) 19 U.S.C. § 1623 (and the implementing regulations in 19 C.F.R. Part 113), governing customs bonds, and requiring the return of improperly-marked merchandise, and permitting the United States to obtain liquidated damages for violations of the bonds. See 19 C.F.R. § 113.62(*l*).

(5) 19 U.S.C. § 1304(h), imposing a ten percent ad valorem marking duty on goods bearing false country-of-origin markings.

(6) 15 U.S.C. §§ 45(m), 70a(a) & 70b(b)(4), branding as unfair competition the importation of misbranded textile fiber, and subjecting violators to civil penalties of up to $10,000 per violation.

ATMI contended that each count adequately alleged a violation of 31 U.S.C. § 3729(a)(7), which imposes liability on a person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." If the defendants had truthfully disclosed the country of origin, ATMI reasoned, they would not face liability for violating the six statutes listed in the complaint. Thus, according to ATMI, the False Claims Act applied, because the defendants made false statements to avoid the "obligations" to pay money (fines, liquidated damages, and duties) arising from their violations of the customs laws.

The defendants sought to change venue to Columbus, Ohio, the principal place of business for most of the defendants. The defendants also moved to dismiss the complaint for failure to state a claim, arguing, *inter alia*, that the False Claims Act referred to existing obligations to the United States, and not to as-yet-unproved violations of statutes. In June 1997, District Judge Harry Hupp granted the motion to transfer venue to the United States District Court for the Southern District of Ohio, where the court permitted the parties to supplement their briefing to concentrate on Sixth Circuit—rather than Ninth Circuit—law. The United States filed an amicus curiae brief to argue that the comprehensive administrative scheme of the customs laws did not preempt private causes of action under the False Claims Act.

On November 13, 1997, District Judge Holschuh granted the defendants' motion to dismiss the complaint. After discussing ATMI's claims and the meaning of "obligation" as used by the False Claims Act, Judge Holschuh concluded that 31 U.S.C. § 3729(a)(7) did not "encompass a claim based on the submission of false records to avoid payment to the United States of forfeitures or fine." "So drastic an expansion in the scope of the False Claims Act, through the use of language which strongly implies that there be some type of financial relationship between the defendant and the United States which is subject to being affected by an act of concealment or avoidance, could not reasonably have been intended [by Congress]."

On November 28, 1997, ATMI moved to disqualify Judge Holschuh and to vacate the order of dismissal, and, in the alternative, to alter or amend the judgment. In the motion to disqualify, ATMI explained that it learned on November 14 that James E. Arnold, a partner with Vorys, Sater, Seymour and Pease, had represented Judge Holschuh in a state proceeding in May 1997. Other attorneys from Vorys,

Sater represented The Limited in ATMI's action under the False Claims Act.

On December 22, 1997, Judge Holschuh issued an order concluding that a reasonable person with knowledge of the surrounding circumstances would believe that the judge had acted impartially in the proceedings. Nevertheless, Judge Holschuh decided voluntarily to recuse himself. He refused to vacate, alter, or amend the judgment, however, although he urged the new judge to review de novo the defendants' motion to dismiss. Judge Beckwith assumed responsibility for the case, ruled that Judge Holschuh's recusal did not mandate that she vacate his judgment, and held that ATMI did not show that Judge Holschuh's November 1997 order worked a manifest injustice or contained a clear error of law. *See United States ex rel. American Textile Mfrs. Institute, Inc. v. The Limited, Inc.*, 179 F.R.D. 541 (S.D.Ohio 1997). Thus, she denied the motion to alter or amend the judgment. ATMI appealed, and the United States participated at oral argument as amicus curiae. We turn to the merits of the appeal.

## II

### A

Congress passed the original False Claims Act in 1863 to respond to Civil War fraud. The statute prohibits the knowing submission of false "claims" to the government, and the Supreme Court has given the statute an expansive reading. *See, e.g., United States v. Neifert–White Co.*, 390 U.S. 228, 232–33, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968). The Act covers "all fraudulent attempts to cause the Government to pay out sums of money." *Id.* at 233, 88 S.Ct. 959. In 1986, Congress amended the Act; the amendments included a provision to extend the Act to cover "reverse false claims." *See* 31 U.S.C. § 3729(a)(7). The new language prohibits the use of false statements or records to "conceal, avoid, or decrease an obligation to pay or transmit money or property to

the Government." *Ibid.* Now, the Act declares that any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

(4) has possession, custody, or control of property or money used, or to be used, by the Government and, intending to defraud the Government or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;

(5) authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge the property; or

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person. . . .

This appeal involves the meaning of "obligation" in 31 U.S.C. § 3729(a)(7).

ATMI's complaint alleges that the defendants violated customs laws and implementing regulations. The joint appendix does not suggest that the government has alleged wrongdoing, let alone that the government has found that the defendants broke any law. Rather, ATMI contends that the defendants violated laws and made false statements to avoid discovery and the consequences. ATMI contends that each customs violation created an obligation to pay money to the government, and that the allegedly-false entry documents served to "conceal, avoid, or decrease" the obligations.

Judge Holschuh characterized the question as

whether a person who violates some statute or regulation that subjects that person to a possible monetary fine or forfeiture of property and who then makes a false statement to conceal that offense is liable under the False Claims Act for having concealed the existence of an "obligation" to the government by means of a false statement.

(J.A. 111). Judge Holschuh discussed the text, history, and purpose of the reverse false claim amendment. Although he did not resolve the scope of the meaning of "obligation," he appears to have decided that a reverse false claim exists only when there is an attempt to avoid a pre-existing financial liability between a defendant and the government. "It is sufficient in the present case for the Court to find ... that the language of § 3729(a)(7) is not so broad as to encompass every statutory or regulatory violation which might lead the United States to attempt to assess a fine or other type of monetary penalty against the violator." After engaging in de novo review, Judge Beckwith refused to alter or amend the opinion. *See The Limited,* 179 F.R.D. at 550 n. 11.

B

■] As a preliminary matter, we note that, whatever the scope of the phrase "obligation to pay or transmit money or property to the Government," 31 U.S.C. § 3729(a)(7), a plaintiff may not state a reverse false claim unless the pertinent obligation attached *before* the defendant made or used the false record or statement. Section 3729(a)(7) prohibits the use of a false statement to "conceal, avoid, or decrease an obligation," and does not use the phrasing "that create an obligation."[1] Where an obligation arises if and only if a defendant makes a false statement or files a false claim (*e.g.,* a law prohibiting the filing of false customs documents), an action under the False Claims Act will not lie (although the government can obtain redress by bringing an action under the customs statute, or perhaps by prosecuting misstatements under 18 U.S.C. § 1001). *Cf. United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1266 (9th Cir.1996) (discussing false certification claims, not reverse false claims) ("Violations of laws, rules, or regulations alone do not create a cause of action under the FCA. It is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a government benefit."), *cert. denied,* 519 U.S. 1115, 117 S.Ct. 958, 136 L.Ed.2d 844 (1997). Keeping the preceding limitation in mind, we turn to the meaning of "*obligation*" in the statute.

■ Although few courts have interpreted 31 U.S.C. § 3729(a)(7), the Eighth Circuit has rejected an expansive reading of the provision. In *United States v. Q International Courier, Inc.,* 131 F.3d 770 (8th Cir.1997), the court interpreted "obligation" after the government prosecuted a reverse false claim action against a courier service alleged to have illegally avoided paying full domestic postage for mail sent from Barbados to United States destinations. *See id.* at 772–74. The court concluded that the regulation at issue does not

---

1. Presumably, it uses "avoid" in the sense of "shirk."

oblige the violator to pay the postage that might have been collected by the Postal Service; it merely sets the limit of a potential penalty against the violator at the amount of postage that might have been collected. A potential penalty, on its own, does not create a common-law debt. A debt, and thus an obligation under the meaning of the False Claims Act, must be for a fixed sum that is immediately due. This regulation merely provides a range of penalties that might be assessed; it does not create an immediate duty to pay a specific sum.

*Id.* at 774. The court set forth its interpretation of § 3729(a)(7):

> To recover under the False Claims Act, we believe that the United States must demonstrate that it was owed a specific, legal obligation at the time that the alleged false record or statement was made, used, or caused to be made or used. The obligation cannot be merely a potential liability: instead, in order to be subject to the penalties of the False Claims Act, a defendant must have had a present duty to pay money or property that was created by a statute, regulation, contract, judgment, or acknowledgment of indebtedness. The duty, in other words, must have been an obligation in the nature of those that gave rise to actions of debt at common law for money or things owed.

*Id.* at 773.[2] *See also United States ex rel. Lamers v. City of Green Bay,* 998 F.Supp. 971, 997–98 (E.D.Wis.1998) (approvingly citing, without adopting, Q International,

and permitting reverse false claims only where the defendant has "an immediate, recognizable obligation" to pay the government), *aff'd,* 168 F.3d 1013 (7th Cir.1999); *United States ex rel. S. Prawer & Co. v. Verrill & Dana,* 962 F.Supp. 206, 209 (D.Me.1997) (holding that § 3729(a)(7) does not cover "possible indeterminate future ... liabilit[y]") ("Whether an obligation would exist depends on the outcome of litigation pursuing the alleged statutory violation."); *United States ex rel. S. Prawer & Co. v. Verrill & Dana,* 946 F.Supp. 87, 95, 94 n. 12 (D.Me.1996) (defining "obligation" as arising only from "a specific contract remedy, a judgment, or an acknowledgment of indebtedness") ("Otherwise, however, there appears to be no way to define the scope of such cases, which would seem to be as broad as any lawyer's creative impulses in defining a possible claim in the first place."). *But see Pickens v. Kanawha River Towing,* 916 F.Supp. 702, 705 (S.D.Ohio 1996) (finding a valid reverse false claim in the allegation that, by failing to note in its vessel's logs the discharge of pollution, the defendant avoided paying fines to the government); *United States ex rel. Stevens v. McGinnis, Inc.,* No. C–1–93–442, 1994 WL 799421, at *6 (S.D.Ohio Oct.26, 1994) (unpublished) (permitting, on facts related to those in *Pickens,* a reverse false claim action "where a defendant has omitted to disclose information to the Government that concealed or avoided its obligation to pay the cleanup costs for its discharges and the associated fines for intentional dumping").

---

**2.** Also, in the panel opinion in *United States v. Pemco Aeroplex, Inc.,* 166 F.3d 1311 (11th Cir.1999), *reh'g en banc granted, opinion vacated,* 179 F.3d 1327 (11th Cir.1999), the court faced a reverse false claim action alleging that the defendant falsely recorded stock numbers and thereby purchased aircraft wings from the government at outrageously low prices. *See id.* at 1312. The panel agreed with the Eighth Circuit that "Section 3729(a)(7) of the False Claims Act requires a specific, legal obligation to pay or to transmit money or property, at the time a false statement is made." *Id.* at 1315 (Hull, J., dissent-

ing). Judge Hull dissented on other grounds, however, contending that the majority erred in finding that "Pemco's filing of the inventory schedule did not create a specific, legal obligation or a present duty to pay money, and the government's complaint does not detail any other type of reverse false claim." *Id.* at 1314–15 (Hatchett, C.J.). Rather, Hull claimed that Pemco had a contractual obligation to return the property. *See id.* at 1316 (Hull, J., dissenting). The 11th Circuit vacated the decision and will rehear the case en banc.

We agree with the reasoning of the Eighth Circuit. Thus, we hold that a reverse false claim action cannot proceed without proof that the defendant made a false record or statement at a time that the defendant owed to the government an obligation sufficiently certain to give rise to an action of debt at common law. Whatever its scope, the False Claims Act clearly encompasses specific and legal duties to pay or transmit money or property to the government. A defendant risks liability when making a false statement to conceal, avoid or decrease obligations such as his prior acknowledgment of indebtedness, a final court or administrative judgment that the defendant owes money or property to the government, or a contractual duty to pay or transmit money or property to the government.

Our review of the statute's text, legislative history, and most reasonable interpretation leads us to this conclusion. Recourse to plain meaning does not quickly resolve the matter. "Obligation" has several meanings:

> A generic word, derived from the Latin substantive "obligatio," having many, wide, and varied meanings, according to the context in which it is used. That which a person is bound to do or forbear; any duty imposed by law, promise, contract, relations of society, courtesy, kindness, etc. Law or duty binding parties to perform their agreement. An undertaking to perform. That which constitutes a legal or moral duty and which renders a person liable to coercion and punishment for neglecting it; a word of broad meaning, and the particular meaning intended is to be gained by consideration of its context. An obligation or debt may exist by reason of a judgment as well as an express contract, in either case there being a legal duty on the part of the one bound to comply with the promise. Liabilities created by contract or law (*i.e.* judgments). As legal term word originally meant a sealed bond, but it now extends to any certain written promise to pay money or do a specific thing. A formal and binding agreement or acknowledgment of a liability to pay a certain sum or do a certain thing. The binding power of a vow, promise, oath, or contract, or of law, civil, political, or moral, independent of a promise; that which constitutes legal or moral duty.

BLACK'S LAW DICTIONARY 968–69 (5th ed.1979) (citations omitted). "Obligation" must have some limit, however. *See, e.g., United States ex rel. S. Prawer & Co. v. Verrill & Dana,* 962 F.Supp. 206, 208 (D.Me.1997) ("The unbounded scope of the relators' argument is demonstrated in their assertion that even a moral obligation is sufficient for a reverse false claim."); *cf.* BLACK'S LAW DICTIONARY 363 (5th ed.1979) (defining "debt") ("[Debt] may even mean a moral or honorary obligation, unenforceable by legal action.").

The Act defines "claim," *see* 31 U.S.C. § 3729(c), but it does not define "obligation." Given the Act's use of "claim" in most provisions of § 3729(a), the Act's employment of "obligation" in § 3729(a)(6) & (7) suggests that Congress intended a different, and more limited, meaning for "obligation." "Claims" encompass requests for payment not only based on contracts, but also because of the many privileges and benefits doled out by the government. When seen in context, the Act's use of "obligation" suggests a more limited meaning:

> (6) knowingly buys, or receives as a *pledge of an obligation or debt,* public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge the property; or
>
> (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an *obligation to pay* or transmit money or property to the Government....

31 U.S.C. § 3729(a) (emphases added). *Cf. United States v. Rivera,* 55 F.3d 703, 712 (1st Cir.1995) (discussing the meaning of "claim," not "obligation," and implicitly distinguishing the terms) ("The key inqui-

ry is thus whether the demand for payment, *whether or not it gives rise to an unconditional legal obligation to pay right away*, has the practical effect of inducing the government to suffer immediate financial harm.") (emphasis added).

The legislative history of the 1986 amendment accords with the preceding interpretation and the distinction between "claim" and "obligation." In its *Neifert–White* opinion, which antedates the 1986 amendments, the Court interpreted "claims" and concluded that the statute "reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." 390 U.S. at 233, 88 S.Ct. 959. The 1986 Senate Report uses similar language to describe the reach of the pre–1986 False Claims Act. *See* S.REP. No. 99–345, at 9, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274. Many courts had refused to apply the Act to efforts to avoid paying the government, however, so Congress amended the Act to include reverse false claims. The amendment's history reflects a concern with efforts to avoid paying "money owed"—a phrase that evokes Black's Law Dictionary's definition of "liabilities created by contracts or laws (*i.e.* judgments)"—and the history cites as examples cases involving disputes over taxes, contracts, and leases. *See* S.REP. No. 99–345, at 15, 18, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5280, 5283.

We have already mentioned those obligations clearly encompassed by the statute: acknowledgements of indebtedness, judgments, and breaches of contract. The claims made by ATMI rely on more attenuated obligations, however, so we must continue to explore the scope of "obligation" as used in the False Claims Act. A statute or regulation might also impose a duty to pay or transmit property, and breaches of such a duty might expose a defendant to liability under the reverse false claims provision. For example, in its decision in *Q International*, the Eighth Circuit confronted the case of a mail courier allegedly engaged in an illegal international remailing scheme. The court re-

fused to find liability under 31 U.S.C. § 3729(a)(7), holding that, although the plaintiff might have shown that the defendant engaged in fraud, the plaintiff failed to show that the defendant violated Postal regulations imposing an obligation to pay postage. *See Q Int'l*, 131 F.3d at 773–74.

The case of *United States v. Raymond & Whitcomb Co.*, 53 F.Supp.2d 436 (S.D.N.Y.1999), complements that of *Q International*. In *Raymond & Whitcomb*, the court found that the defendant, a commercial travel agent, impermissibly used a favorable non-profit mailing rate and thereby violated an obligation sufficient to incur reverse false claims liability. Where the regulations at issue in *Q International* merely released the Postal Service from an obligation not to obtain payment from those impermissibly using international rates, the regulations at issue in *Raymond & Whitcomb* imposed an affirmative obligation on mailers to pay the proper domestic postage. *See id.* at 445–47. One treatise (admittedly authored by an attorney who represented The Limited in the instant matter) anticipated the distinction, explaining that:

> Such obligations [those actionable under the reverse false claims provision] exist, for example, in logging and concession contracts on public lands (where the contractor owes the United States a percentage of gross or net income) or in an established amount for the price of stamps or other postal services, which are essentially contractual in nature.... While the precise amount may be uncertain, these are obligations or liabilities, arising under a contract or quasi contract that existed at the time the false statement is made.

JOHN T. BOESE, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS 2–41–42 (1999 Supp.).

Although we do not decide the matter, we think that the history of the 1986 amendments suggest that Congress may well have intended reverse false claims liability to extend to obligations created by statute or regulation, at least where the

statute or regulation imposes an obligation "essentially contractual in nature," such as the imposition of the requirement that those using the Postal Service pay the appropriate rate. The implications of such liability give us pause, however, as such an interpretation has broad potential reach.[3] The Federal Government charges for many services apart from mail delivery, and establishes universally-applicable rates for each service. For example, the National Air and Space Museum in Washington, D.C. contains the Samuel P. Langley IMAX Theatre, which shows films on an impressively-large screen. Museum-goers must pay for the privilege, and the theater provides discounts for "Youth" (categorized as those aged 2–17) and "Seniors" (categorized as those aged 55 and higher). *See Smithsonian, National Air & Space Museum, Langley Show Times* (visited August 26, 1999) < http://www.nasm.edu/ nasm/IMAX/IMAXtimes.html. > If a fifty-four-year-old malfeasor lied to the cashier to obtain a discount, a suspicious fellow patron could bring a reverse false claim action against the wrongdoer, who would find the fraudulently-obtained admission discount outweighed by the imposition of a civil penalty of not less than $5,000.

■ We leave for another day the question of the IMAX Theatre, however, because the plaintiffs in the instant case found their claims on purported obligations that fall outside the scope of "obligation" as used in the False Claims Act, even if we interpret the Act to permit those claims contemplated in the preceding two paragraphs. A defendant does not execute a reverse false claim by engaging in behavior that might or might not result in the creation of an obligation to pay or transmit money or property to the government. Contingent obligations—those that will arise only after the exercise of discretion by government actors—are not contemplated by the statute. Examples of contingent obligations include those arising from civil and criminal penalties that impose monetary fines after a finding of wrongdoing: as opposed to quasi-contractual obligations created by statute or regulation (such as the imposition of a standard mailing rate), contingent obligations (such as the imposition of a civil penalty for an antitrust violation) attach only after the exercise of administrative or prosecutorial discretion, and often after a selection from a range of penalties.

When the 1986 amendment's legislative history discusses disputes over whether the pre-amendment Act covered reverse false claims, it mentions "attempts to defeat or reduce the amount of a claim or potential claim by the United States against [a person]." S.Rep. No. 99–345, at 18, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5283. Although one could use "potential claim" to argue that Congress intended the amendment to reach possible, or contingent, liabilities (as opposed to those confirmed by judgments), the context suggests the Senate Report off-handedly used "claim" to reflect legal claims based on contracts or leases: the Report follows the mention of "potential claim" by discussing cases involving fraudulent tax returns, government contracts, and leases with the government. *See ibid.* The Report does not mention, and probably did not consider, false statements made to avoid possible civil or criminal liability.

■ Our holding that a defendant's behavior regarding a contingent obligation cannot engender a reverse false claim action draws support from a consideration of the consequences of the competing interpretation. Of course, a court may not

---

**3.** 31 U.S.C. § 3730 provides incentives for private parties to police actionable frauds, as it allows them to bring actions under the False Claims Act, and to receive up to 30 percent of the proceeds of the action. 31 U.S.C. § 3730(d)(2) also provides for reimbursement of reasonable attorneys' fees and costs. The preceding statutory sections, combined with the mandate of 31 U.S.C. § 3729(a), which imposes a civil penalty of $5,000 to $10,000 for each violation and awards treble damages to the government, give plaintiffs powerful incentives to lodge such actions.

allow policy considerations to trump the plain language of a statute. *See, e.g., Brogan v. United States*, 522 U.S. 398, ——, 118 S.Ct. 805, 810, 139 L.Ed.2d 830 (1998). Here, however, Congress has used an ambiguous term, and considering policy implications helps to inform us what Congress intended "obligation" to mean, in light of the probable flood of litigation that would follow from an overly expansive interpretation of the reverse false claims provision. *Cf. United States v. American Heart Research Found.*, 996 F.2d 7, 10 (1st Cir. 1993) (construing a different provision of the False Claims Act, interpreting the scope of "claim") ("But it is one thing to construe ambiguous language broadly in accord with a remedial purpose; it is quite another matter to stretch language beyond normal usage or understanding, when the natural reading matches the very problem that concerned Congress at the time the statute was enacted.") (citation and internal quotation marks omitted).

■ In ATMI's case, the defendants did not have a contract or lease with the government, and did not ask for money or benefits from the government. The government has not brought a criminal or civil action against the defendants, and thus has no judgment against them. Rather, the defendants stand accused of making false statements to avoid paying customs duties, fines, and taxes. If the reverse false claims provision encompasses the defendants' actions, it has incredible scope, permitting suits against any person who makes a false statement to the federal government that he did not commit a statutory or regulatory violation that *might have* led to the imposition of a fine, payment of liquidated damages, imposition of a tax, or forfeiture of property.

[T]his expansive interpretation of Section (a)(7), if adopted broadly, would have had the potential to significantly expand False Claims Act jurisdiction into areas *not* involving the expenditure of Federal funds. The significance of this expansion can be conceptualized by imagining a motorist who, stopped for speeding in a Federal park, blurts out, "But, officer, I was only doing the speed limit!" Assuming the motorist's statement to be false, this attempt to avoid a $75 speeding ticket, payment to which the United States is entitled, could generate liability for a $10,000 penalty under the False Claims Act.

John T. Boese, Civil False Claims and Qui Tam Actions 2–39 (1999 Supp.). Vivid as it is, Boese's example understates the breadth of reverse false claims liability under ATMI's interpretation. Boese discusses a federal crime (*i.e.*, speeding in a Federal park) that is prosecuted almost automatically and with a near-guarantee of attendant financial obligation (*i.e.*, the fine). ATMI asks us to permit reverse false claims based on allegedly false statements made to conceal liability under criminal statutes that prosecutors enforce only after exercising discretion, and that, if violated, will not necessarily give rise to "an obligation to pay or transmit money or property to the government." For example, ATMI charges that the defendants made false statements to conceal their liability under 18 U.S.C. § 545, a statute prohibiting the smuggling of goods into the United States and permitting the imposition of a fine, a term of imprisonment, or both. Under that interpretation, reverse false claims liability would attach to any person making any false statement to conceal, avoid, or decrease his potential criminal liability under a law that lists among a range of penalties the imposition of a fine.[4]

---

4. 18 U.S.C. § 2113 permits the imposition of a fine or term of imprisonment for those convicted of federal bank robbery charges. Imagine a bank robber captured by police and interrogated as a suspect. If an officer asks, "Do you know who robbed the bank?" and the robber denies knowledge, or blames another, or makes up an alibi, the robber would incur reverse false claim liability under ATMI's interpretation. If prosecuted, if convicted, and if fined, he would have an obligation to pay money to the government. His response to the police serves to conceal the obligation.

The expansive interpretation is flawed because not only does it require a judicial determination of whether the government would have exercised its discretion not to pursue relief, but it also would require consideration of whether the government would have sought relief satisfying the False Claims Act's linguistic trigger of "money or property" (fines, taxes, and so forth). Under this interpretation, a court would also have to calculate the amount of the financial penalty (taking into account concerns of retribution and deterrence, in addition to restitution)—a far cry from the often-rote calculations accompanying government contract disputes (the heartland of claims under the Act). Rejecting the expansive interpretation does not reward wrongdoers, of course, as they still face penalties for violating the underlying statute (the speeding motorist will have to pay the ticket, if he does not contest it and win).

Additionally, the rejection of the expansive interpretation accords with the position of the United States as advanced in its 1991 filings in a case in the Eastern District of California, *United States ex rel. Sequoia Orange Co. v. Oxnard Lemon Co.*, CV. No. F–91–194 OWW. Sequoia alleged that Oxnard submitted false reports to the Lemon Administrative Committee to avoid paying statutory forfeitures and assessments, and to ship more lemons than allowed by the Committee's regulations. The government contended that Sequoia did not state a claim under 31 U.S.C. § 3729(a)(7): "an attempt to circumvent an obligation to pay created solely as the result of a violation of an administrative enforcement statute does not constitute a cognizable claim under the Act." "False claims submitted by individuals or entities seeking to avoid payment to the Government of administrative fines, penalties or forfeitures (OSHA, FAA, SEC, etc.), or criminal fines imposed pursuant to Title 18 of the United States Code, are not the stuff of False Claims Act lawsuits. . . ."

The government made similar arguments in its reply brief, and contended that an expansive interpretation would interfere with federal regulatory enforcement schemes, and permit companies to use qui tam litigation to harass competitors.[5]

The government submitted an amicus brief in ATMI's case and departed from its 1991 position. The amicus brief urges this court to affirm the district court's judgment, but asks that this court hold that the district court adopted an overly-restrictive interpretation of the statute. The government contends that:

> [T]he "reverse false claims" provision encompasses within its scope those obligations owed to the government (under statute, regulation, contract, or quasi-contract) arising from the provision of some privilege, right or benefit in return for which the recipient owes money or property. If the government has provided no privilege, right or benefit, but is imposing liability on a party solely because that party performed an act that the government has defined as wrongful, the monetary consequences of that wrongful act are *not* actionable under the FCA. Accordingly, the Act applies to false statements made to avoid payment of contractual obligations [even in the absence of a judgment], or monetary obligations, such as customs duties or user fees, imposed by statute or regulation. It does not apply, however, where the government has granted no right, privilege, or benefit and where the false statements at issue conceal only the fact that the defendant engaged in criminal or otherwise unlawful conduct and therefore might properly be subject to fines, penalties, or forfeitures.

The government observes that the Act also applies to "obligations" reduced to judgments and to "obligations" incorporated in government contracts.

5. The district court rejected the government's interpretation, however. *See United States ex rel. Sequoia Orange Co. v. Oxnard Lemon Co.*, 1992 WL 795477, at *6 (E.D.Cal. May 4, 1992).

Although the government's position has some force, we fear the hazards of attempting to determine the meaning of "right, privilege, or benefit," especially in light of Congress's extensive regulation of international and interstate commerce. We reiterate our holding, and summarize, by concluding that 31 U.S.C. § 3729(a)'s definition of "obligation" certainly includes those arising from acknowledgements of indebtedness, final judgments, and breaches of government contracts, and that the definition certainly does not include those contingent obligations that arise only because the government has prohibited an act, or arising after the exercise of government discretion. We leave for a more appropriate case the status of those obligations arising from the provision of "rights, privileges, or benefits," and those obligations created by statute or regulation that are "essentially contractual in nature."

## C

With the preceding guidelines in mind, we turn to ATMI's specific claims, and hold that the district court properly dismissed the complaint. ATMI brought six counts against the defendants, contending that the defendants' filing of false documents concealed from the government the defendants' liability under several statutes. Counts one (18 U.S.C. § 545), two (19 U.S.C. § 1595a(b)), three (19 U.S.C. § 1592), and six (15 U.S.C. § § 45(m), 70a(a) & 70b(b)(4)) rely on the theory of contigent obligations, rejected *supra* in Part II.B. Count four (19 U.S.C. § 1623 and 19 C.F.R. Part 113), involving the posting of a customs bond, also involves an obligation that arises only after a defendant breaks the law (by mismarking the country of origin), and implicates a monetary obligation that arises only after administrative investigation and a decision to notify the defendant that the government seeks payment of the liquidated damages it believes are due under the bond.

■ Count five, alleging that the defendants filed false documents to conceal liability under 19 U.S.C. § 1304(h), presents the most difficulty, as it involves a provision applying a ten percent ad valorem marking duty to goods having false country-of-origin markings. We affirm, however, because the marking duty applies only when a defendant engages in conduct that the statute defines as wrongful. The government contrasts the marking duty with "standard customs duties that are payable in exchange for a right to import goods into the United States." The distinction appears rather fine. One court has found that wrongful use of a (domestic) postage non-profit rate yields a "clear actual obligation to pay the deficiency," *United States v. Raymond & Whitcomb Co.*, 53 F.Supp.2d 436, 1999 WL 430552, at *9 (S.D.N.Y. June 19, 1999), and the marking duty does not seem too far removed. In light of a recent decision by the Federal Circuit, however, the government's distinction appears tenable: unlike the domestic postal duty and most customs duties, the ad valorem duty applies if and only if the importer makes a false statement:

> [19 U.S.C.] Section 1592(a) prohibits misrepresentations resulting from misconduct—fraud, gross negligence, or negligence. Thus, the actions that violate § 1592(a) are the acts of fraudulently or negligently mismarking imported goods. If the act of culpably mismarking the goods deprived the government of duties, for example, if the goods were marked with a country of origin having a lower duty than the country from which the goods actually originated, then those duties of which the government was deprived are of the type whose tender is required for prior disclosure treatment. We hold that the 10 percent ad valorem mismarking duties do not fall into this category.

> The act of culpably mismarking goods cannot be said to have deprived the government of the 10 percent ad valorem duty assessed under 1304(f). To the contrary, but for the mismarkings (followed by the failure to export, destroy, or remark the articles in accordance

with section 1304), the duty could not have arisen. ·

*Pentax Corp. v. Robison*, 125 F.3d 1457, 1463 (Fed.Cir.1997), *amended on reh'g by* 135 F.3d 760 (Fed.Cir.1998). Thus, the district court's judgment on count five comports with our observation above at pages 8–9 that "a plaintiff may not state a reverse false claim unless the pertinent obligation attached *before* the defendant made or used the false record or statement."

### III

] Because this appeal required us to discern the meaning of "obligation," we engaged in plenary review of the district court's final order. *Cf., e.g., In re Griggs*, 965 F.2d 54, 56 (6th Cir.1992) ("Because this case presents an issue of statutory interpretation, which is a question of law, our review of the district court's decision is de novo."). In light of our disposition of the case as a matter of law, and given District Judge Beckwith's de novo review of District Judge Holschuh's decision, we see no need to decide whether Judge Holschuh faced mandatory recusal, and to require a third district judge to decide whether ATMI has stated viable claims.

] Nevertheless, we write to clarify that a litigant's duty to investigate the facts of his case does not include a mandate for investigations into a judge's impartiality. Judge Beckwith erred by suggesting otherwise. After proclaiming that "[t]he strategy employed by Relator [filing the recusal motion two weeks after receiving an unfavorable dispositive ruling] is questionable at best, and the Court refuses to reward Relator or encourage this trend," she concluded that subsection of her opinion by stating that "[l]itigants have a duty to investigate and inform the court of any perceived biases before the court and the parties invest time and expense in a case. Relator has posited no reason for the failure to make a timely inquiry into Judge Holschuh's background." *United States ex rel. American Textile Mfrs. Institute Inc. v. The Limited, Inc.*, 179 F.R.D. 541, 546 (S.D.Ohio 1997).

] We believe instead that litigants (and, of course, their attorneys) should assume the impartiality of the presiding judge, rather than pore through the judge's private affairs and financial matters. Further, judges have an ethical duty to "disclose on the record information which the judge believes the parties or their lawyers might consider relevant to the question of disqualification." *Porter v. Singletary*, 49 F.3d 1483, 1489 (11th Cir. 1995). "[B]oth litigants and counsel should be able to rely upon judges to comply with their own Canons of Ethics." *Ibid.* In ATMI's case, Judge Holschuh possibly did not consider the matter sufficiently relevant to merit disclosure, but his nondisclosure did not vest in ATMI a duty to investigate him.

### IV

The judgment of the district court is AFFIRMED.