[No. B172190. Second Dist., Div. One. Jan. 31, 2005.]

THE STATE OF CALIFORNIA ex rel. WILLIAM BOWEN, Plaintiff and Appellant, v.
BANK OF AMERICA CORPORATION et al., Defendants and Respondents.

---

---

---

## Counsel

Markun Zusman & Compton, David S. Markun and Robert K. Crowe for Plaintiff and Appellant.

Heller Ehrman White & McAuliffe, Jonathan P. Hayden, Warrington S. Parker III and Elizabeth S. Pehrson for Defendant and Respondent Bank of America.

Gary F. Torrell and Christine M. Johnson for Defendant and Respondent Downey Savings and Loan Association.

Jeffer Mangels Butler & Marmaro, John L. Hosack and Andrea Y. Slade for Defendant and Respondent Union Bank of California.

---

## Opinion

**SUZUKAWA, J.**[*]—Plaintiff filed a whistleblower action against defendants for allegedly violating the False Claims Act (FCA) (Gov. Code, § 12650 et seq.) by failing to report reconveyance fees as escheated property under the California Unclaimed Property Law (UPL) (Code Civ. Proc., § 1500 et seq.). Given the uncertain and unliquidated nature of defendants' obligation to refund the reconveyance fees at issue herein, we conclude the fees were not subject to escheat. Accordingly, the demurrer was properly sustained without leave to amend on the ground that the complaint fails to state a cause of action. We affirm the judgment of dismissal.

### BACKGROUND

This case involves three distinct statutory schemes: (1) Civil Code section 2941, subdivision (j), which requires lenders to refund reconveyance fees under certain circumstances;[1] (2) the UPL, which requires banks and other

---

[*] Judge of the Los Angeles Superior Court. assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] Civil Code section 2941, subdivision (j) states: "Notwithstanding any other penalties, if a beneficiary [lender] collects a fee for reconveyance and thereafter has knowledge, or should have knowledge, that no reconveyance has been recorded, the beneficiary shall cause to be recorded the reconveyance, or in the event a release of obligation is earlier and timely

financial institutions to report and deliver abandoned or escheated property to the state; and (3) Government Code section 12651, subdivision (a)(7), which prohibits reverse false claims violations, which are defined as "[k]nowingly mak[ing], us[ing], or caus[ing] to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision." (Gov. Code, § 12651, subd. (a)(7).)

Plaintiff alleged that defendants' failure to report certain reconveyance fees in order to conceal an obligation to deliver escheated property to the state constituted reverse false claims violations.

### A. Civil Code Section 2941

We infer from plaintiff's complaint and opening brief that the underlying loan agreements which authorized the disputed reconveyance fees were evidenced by promissory notes and deeds of trust rather than mortgages. While the term "mortgage" appears occasionally in the complaint, it appears that plaintiff intended to refer to deeds of trust as the relevant loan agreements which authorized the reconveyance fees which are at issue herein.

■ "The majority of loans secured by real property in California are evidenced by a promissory note and a deed of trust. The promissory note is a promise the debtor/trustor makes to the lender/beneficiary to repay the loan on the terms indicated in the note. (See 4 Cal. Real Estate Law & Practice, Secured Transactions, §§ 110.01–110.02, pp. 110-4 to 110-6.) A deed of trust is the document which evidences the debt that is secured by a particular piece of real property. The deed of trust contains a legal description of the real property to which it applies and identifies: (1) the debtor/trustor; (2) the lender/beneficiary; and (3) the trustee. A trustee of a deed of trust has two principal functions: (1) to foreclose against the real property when necessary and (2) to issue and record a reconveyance when the debt has been paid. (See Bernhardt, Cal. Mortgage and Deed of Trust Practice (Cont.Ed.Bar 2d ed. 1990) Real Property Secured Transactions, § 1.28, pp. 36–37; see also 4 Miller & Starr, Cal. Real Estate (2d ed. 1989) Deeds of Trusts and Mortgages, § 9.2, p. 10, § 9.3, pp. 15–18.)" (*Trustors Security Service v. Title Recon Tracking Service* (1996) 49 Cal.App.4th 592, 595 [56 Cal.Rptr.2d 793].)

■ To recoup the cost of reconveying title, Civil Code section 2941 allows lenders and trustees to charge borrowers a reasonable reconveyance

---

recorded, the beneficiary shall refund to the trustor [borrower] the fee charged to perform the reconveyance. Evidence of knowledge includes, but is not limited to, notice of a release of obligation pursuant to paragraph (3) of subdivision (b)."

fee. The statute defines reconveyance fees not over $45 as presumptively reasonable. (Civ. Code, § 2941, subd. (e)(2).) According to the complaint, the typical reconveyance fee before 2001 was $65.

The statutory scheme for recording reconveyances includes the following: (1) within 30 calendar days after satisfaction of the note, the lender shall deliver the necessary documents to the trustee and request a full reconveyance of the deed of trust (Civ. Code, 2941, subd. (b)(1));[2] (2) within 21

---

[2] For deeds of trust, before the 30-day time limit was added to Civil Code section 2941, subdivision (b)(1) in 2001 (Stats. 2001, ch. 560, § 1), there was no statutory time limit within which lenders were required to deliver the necessary documents to trustees.

Civil Code section 2941 provides in part: "(b)(1) Within 30 calendar days after the obligation secured by any deed of trust has been satisfied, the beneficiary or the assignee of the beneficiary shall execute and deliver to the trustee the original note, deed of trust, request for a full reconveyance, and other documents as may be necessary to reconvey, or cause to be reconveyed, the deed of trust.

"(A) The trustee shall execute the full reconveyance and shall record or cause it to be recorded in the office of the county recorder in which the deed of trust is recorded within 21 calendar days after receipt by the trustee of the original note, deed of trust, request for a full reconveyance, the fee that may be charged pursuant to subdivision (e), recorder's fees, and other documents as may be necessary to reconvey, or cause to be reconveyed, the deed of trust. [¶] . . . [¶]

"(C) Following execution and recordation of the full reconveyance, upon receipt of a written request by the trustor or the trustor's heirs, successors, or assignees, the trustee shall then deliver, or cause to be delivered, the original note and deed of trust to the person making that request. [¶] . . . [¶]

"(2) If the trustee has failed to execute and record, or cause to be recorded, the full reconveyance within 60 calendar days of satisfaction of the obligation, the beneficiary, upon receipt of a written request by the trustor or trustor's heirs, successor in interest, agent, or assignee, shall execute and acknowledge a document pursuant to Section 2934a substituting itself or another as trustee and issue a full reconveyance.

"(3) If a full reconveyance has not been executed and recorded pursuant to either paragraph (1) or paragraph (2) within 75 calendar days of satisfaction of the obligation, then a title insurance company may prepare and record a release of the obligation. However, at least 10 days prior to the issuance and recording of a full release pursuant to this paragraph, the title insurance company shall mail by first-class mail with postage prepaid, the intention to release the obligation to the trustee, trustor, and beneficiary of record, or their successor in interest of record, at the last known address. [¶] . . . [¶]

"(B) The release issued pursuant to this subdivision shall be entitled to recordation and, when recorded, shall be deemed to be the equivalent of a reconveyance of a deed of trust. [¶] . . . [¶]

"(5) Paragraphs (2) and (3) do not excuse the beneficiary or the trustee from compliance with paragraph (1). Paragraph (3) does not excuse the beneficiary from compliance with paragraph (2). [¶] . . . [¶]

"(D) The violation of this section shall make the violator liable to the person affected by the violation for all damages which that person may sustain by reason of the violation, and shall require that the violator forfeit to that person the sum of five hundred dollars ($500).

"(e)(1) The trustee, beneficiary, or mortgagee may charge a reasonable fee to the trustor or mortgagor, or the owner of the land, as the case may be, for all services involved in the preparation, execution, and recordation of the full reconveyance, including, but not limited to,

calendar days after receiving the documents and request for reconveyance, the trustee shall record the full reconveyance (Civ. Code, § 2941, subd. (b)(1)(A)); (3) if the trustee fails to record the full reconveyance within 60 calendar days of the satisfaction of the note, the lender, upon receiving a written request from the borrower, shall substitute itself or another as trustee and issue a full reconveyance (Civ. Code, § 2941, subd. (b)(2)); and (4) if, after 75 calendar days from the satisfaction of the note, the full reconveyance has not been recorded by either the trustee or a substitute trustee, the title insurance company may record a release of obligation after providing notice to the trustee, lender, and borrower (Civ. Code, § 2941, subd. (b)(3)).[3]

■ Subdivision (j), which contains the refund requirement at issue in this case, was added to Civil Code section 2941 in 2001. (Stats. 2001, ch. 560, § 1, p. 3287.) Under subdivision (j), if the lender collects a reconveyance fee but later has knowledge (or should have knowledge) that no reconveyance was recorded, the lender shall either: (1) cause the reconveyance to be recorded; or (2) refund the reconveyance fee to the borrower if a timely release of obligation was earlier recorded by the title insurance company. Evidence of the lender's knowledge that a timely release of obligation was earlier recorded "includes, but is not limited to, notice of a release of obligation pursuant to paragraph 3 of subdivision (b)" of section 2941. (Civ. Code, § 2941, subd. (j).)

One who violates Civil Code section 2941 may be held civilly liable to the person affected by the violation for a $500 penalty, plus "all damages which that person may sustain by reason of the violation[.]" (Civ. Code, § 2941, subd. (d).)

---

document preparation and forwarding services rendered to effect the full reconveyance, and, in addition, may collect official fees. This fee may be made payable no earlier than the opening of a bona fide escrow or no more than 60 days prior to the full satisfaction of the obligation secured by the deed of trust or mortgage.

"(2) If the fee charged pursuant to this subdivision does not exceed forty-five dollars ($45), the fee is conclusively presumed to be reasonable. [¶] . . . [¶]

"(g) No fee or charge may be imposed on the trustor in connection with, or relating to, any act described in this section except as expressly authorized by this section. [¶] . . . [¶]

"(j) Notwithstanding any other penalties, if a beneficiary collects a fee for reconveyance and thereafter has knowledge, or should have knowledge, that no reconveyance has been recorded, the beneficiary shall cause to be recorded the reconveyance, or in the event a release of obligation is earlier and timely recorded, the beneficiary shall refund to the trustor the fee charged to perform the reconveyance. Evidence of knowledge includes, but is not limited to, notice of a release of obligation pursuant to paragraph (3) of subdivision (b)."

[3] The alternative method of clearing title by allowing the title insurer to record a release of obligation was added to Civil Code section 2941 in 1988. (Stats. 1988, ch. 1006, § 1, p. 3287, operative July 1, 1989.) Before July 1, 1989, the sole method of clearing title upon satisfaction of the note was to record a full reconveyance. When recorded, a release of obligation is the equivalent of a reconveyance of a deed of trust. (Civ. Code, § 2941, subd. (b)(3)(B).)

In a suit for violation of Civil Code section 2941, the injured person's recovery is measured by "the general rule of tort damages, namely, that all detriment proximately caused by breach of a legal duty is compensable, including damages for emotional distress. [Citations.]" (*Pintor v. Ong* (1989) 211 Cal.App.3d 837, 841–842 [259 Cal.Rptr. 577].) In *Pintor*, for example, a homeowner recovered $15,000 for emotional distress caused by a two-and-one-half-year delay in recording the reconveyance. In *Panagotacos v. Bank of America* (1998) 60 Cal.App.4th 851, 856–857 [70 Cal.Rptr.2d 595], on the other hand, where no emotional distress resulted from the brief delay in recording the reconveyance, damages were limited to the statutory penalty which was then $300.

In addition to damages, a Civil Code section 2941 violation may result in criminal punishment: "Every person who willfully violates Section 2941 is guilty of a misdemeanor punishable by fine of not less than fifty dollars ($50) nor more than four hundred dollars ($400), or by imprisonment in the county jail for not to exceed six months, or by both such fine and imprisonment. [¶] For purposes of this section, 'willfully' means simply a purpose or willingness to commit the act, or make the omission referred to. It does not require an intent to violate the law, to injure another, or to acquire any advantage." (Civ. Code, § 2941.5.)

B. *The Unclaimed Property Law*

██ The UPL requires that when various types of property (such as bank accounts, certificates of deposit, travelers' checks, securities) have been abandoned for a certain period (usually three years), the holders of such property (usually banks or financial institutions) must report and deliver such property to the State Controller. (Code Civ. Proc., §§ 1530, 1532.)[4] The state

---

[4] Code of Civil Procedure section 1530 provides: "(a) Every person holding funds or other property escheated to this state under this chapter shall report to the Controller as provided in this section. [¶] (b) The report shall be on a form prescribed or approved by the Controller and shall include: [¶] (1) Except with respect to traveler's checks and money orders, the name, if known, and last known address, if any, of each person appearing from the records of the holder to be the owner of any property of value of at least fifty dollars ($50) escheated under this chapter. [¶] (2) In the case of escheated funds of life insurance corporations, the full name of the insured or annuitant, and his or her last known address, according to the life insurance corporation's records. [¶] (3) In the case of the contents of a safe deposit box or other safekeeping repository or in the case of other tangible property, a description of the property and the place where it is held and may be inspected by the Controller. The report shall set forth any amounts owing to the holder for unpaid rent or storage charges and for the cost of opening the safe deposit box or other safekeeping repository, if any, in which the property was contained. [¶] (4) The nature and identifying number, if any, or description of any intangible property and the amount appearing from the records to be due, except that items of value under fifty dollars ($50) each may be reported in aggregate. [¶] (5) Except for any property reported in the aggregate, the date when the property became payable, demandable, or returnable, and

then holds the unclaimed property for the missing owners, who may claim their property at any time. (Code Civ. Proc., § 1540.)[5]

The Controller is responsible for enforcing the UPL and may investigate suspected violations. "The Controller or an authorized licensing or regulating agency may, at reasonable times and on reasonable notice, examine the records of any person whom the Controller reasonably believes to have failed to report escheated property. ([Code Civ. Proc., §] 1571.) An action may be brought to enforce the duty to permit this examination, or to obtain a judicial determination that property is subject to escheat. ([Code Civ. Proc., §] 1572[, subd.] (a)(1), (2).) And criminal penalties are prescribed for wilful failure to report. ([Code Civ. Proc., §] 1576[, subd.] (a).)" (4 Witkin, Summary of Cal. Law (9th ed. 1987) Personal Property, § 32, p. 35.)

 Penalties for willful failure to report under the UPL may only be imposed *after* the Controller has given notice by certified mail of the violation and the violator has failed to respond. (Code Civ. Proc., § 1576, subd. (c).) In this case, there is no allegation that defendants received such notification from the Controller or that defendants failed to respond to any such notice.

---

the date of the last transaction with the owner with respect to the property. [¶] (6) Other information which the Controller prescribes by rule as necessary for the administration of this chapter. [¶] (c) If the holder is a successor to other persons who previously held the property for the owner, or if the holder has changed his or her name while holding the property, he or she shall file with his or her report all prior known names and addresses of each holder of the property. [¶] (d) The report shall be filed before November 1 of each year as of June 30 or fiscal yearend next preceding, but the report of life insurance corporations, and the report of all insurance corporation demutualization proceeds subject to Section 1515.5, shall be filed before May 1 of each year as of December 31 next preceding. The initial report for property subject to Section 1515.5 shall be filed on or before May 1, 2004, with respect to conditions in effect on December 31, 2003, and all property shall be determined to be reportable under Section 1515.5 as if that section were in effect on the date of the insurance company demutualization or related reorganization. The Controller may postpone the reporting date upon his or her own motion or upon written request by any person required to file a report. [¶] (e) The report, if made by an individual, shall be verified by the individual; if made by a partnership, by a partner; if made by an unincorporated association or private corporation, by an officer; and if made by a public corporation, by its chief fiscal officer or other employee authorized by the holder."

Code of Civil Procedure section 1532, subdivision (a) provides in part: "Every person filing a report as provided by Section 1530 shall pay or deliver to the Controller all escheated property specified in the report at the same time the report is filed. . . ."

[5] Code of Civil Procedure section 1540, subdivision (a) provides in part: "Any person, excluding another state, who claims an interest in property paid or delivered to the Controller under this chapter may file a claim to the property or to the net proceeds from its sale. . . ." Code of Civil Procedure section 1501.5, subdivision (a) provides that "[n]otwithstanding any provision of law to the contrary, property received by the state under this chapter shall not permanently escheat to the state."

The penalties for willfully failing to file reports under the UPL are set forth in Code of Civil Procedure section 1576: "(a) Any person who willfully fails to render any report or perform other duties, including use of the report format described in Section 1530, required under this chapter shall be punished by a fine of one hundred dollars ($100) for each day such report is withheld or such duty is not performed, but not more than ten thousand dollars ($10,000). [¶] (b) Any person who willfully refuses to pay or deliver escheated property to the Controller as required under this chapter shall be punished by a fine of not less than five thousand dollars ($5,000) nor more than fifty thousand dollars ($50,000). [¶] (c) No person shall be considered to have willfully failed to report, pay, or deliver escheated property, or perform other duties unless he or she has failed to respond within a reasonable time after notification by certified mail by the Controller's office of his or her failure to act."

## C. *The False Claims Act*

Plaintiff, who was neither a party nor a third party beneficiary to any of the deeds of trust involved in this case, is not suing for breach of contract or violation of Civil Code section 2941. Instead, based on the assumption that defendants' failures to report and deliver the reconveyance fees as escheated property under the UPL are punishable as reverse false claims violations under the FCA, plaintiff has sued as a whistleblower[6] for himself and the People of the State of California.

■ "California's False Claims Act was enacted in 1987 and is patterned largely on similar federal legislation (31 U.S.C. § 3729 et seq.). (*American Contract Services v. Allied Mold & Die, Inc.* (2001) 94 Cal.App.4th 854, 858 [114 Cal.Rptr.2d 773].) The [FCA] is designed to supplement governmental efforts to identify and prosecute fraudulent claims made against state and local governmental entities by authorizing private parties (referred to as qui tams or relators) to bring suit on behalf of the government. (*American Contract Services,* at p. 858.) The ultimate purpose of the [FCA] is to protect the public fisc. (*Ibid.*) To that end, the [FCA] must be construed broadly so as to give the widest possible coverage and effect to its prohibitions and

---

[6] Instead of whistleblower, the FCA uses the term "qui tam," which " 'is part of the longer Latin phrase "*qui tam pro domino rege quam pro se ipso in hac parte sequitur,*" which means "who brings the action for the king as well as for himself." See *United States ex rel. Stinson v. Prudential Ins.* [(3d Cir. 1991)] 944 F.2d 1149, 1152, n. 2 (quoting *Erickson v. American Inst. of Biological Sciences,* 716 F.Supp. 908, 909 n. 1 (E.D.Va.1989) and William Blackstone, *Commentaries on the Law of England* 160 (1768)).' (*U.S. ex rel. LaCorte v. SmithKline Beecham* (3d Cir.1998) 149 F.3d 227, 230, fn. 1.)" (*City of Hawthorne ex rel. Wohlner v. H&C Disposal Co.* (2003) 109 Cal.App.4th 1668, 1672, fn. 2 [1 Cal.Rptr.3d 312] (*City of Hawthorne*).)

remedies. (*LeVine v. Weis* (2001) 90 Cal.App.4th 201, 210 [108 Cal.Rptr.2d 562].)" (*City of Hawthorne, supra,* 109 Cal.App.4th at pp. 1676–1677.)

Plaintiff seeks damages under the FCA for defendants' failure to report as escheated property the reconveyance fees that allegedly were either wrongfully charged in breach of the relevant deeds of trust[7] or were wrongfully withheld in violation of Civil Code section 2941, subdivision (j).

The FCA provides for treble damages, costs, attorney fees, and a civil penalty of up to $10,000 for each false claim, against any person who, among other things, "[k]nowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision." (Gov. Code, § 12651, subd. (a)(7).)

## PROCEDURAL HISTORY

In June 1999, plaintiff filed four related actions in Los Angeles County Superior Court: *Bowen v. Washington Mutual Bank* (No. BC 210351); *Bowen v. Bank of America* (No. BC 211299); *Bowen v. First Interstate Bank* (No. BC 210966); and *Bowen v. Bank of America* (No. BC 211013).

Plaintiff filed the related cases "as a *qui tam* (whistleblower) under the California False Claims Act ('FCA') alleging 36 financial institutions ('banks') failed to properly escheat to the State monies from reconveyance fees improperly charged to homeowners (Gov. Code § 12650 et seq.[).] The F[CA] requires actions containing a false claims cause of action to be filed under seal and prohibits service on any defendant until the State, the real party in interest, has an opportunity to investigate and determine whether or not to intervene. (Gov. Code, § 12652[, subd.] (c)(2).) [¶] The State declined to intervene in each of these related cases in November of 2001[.]" (Italics omitted.)

After the complaints were unsealed, the court granted plaintiff's request to merge the four complaints into a single amended master complaint. The amended master complaint alleged causes of action for breach of contract[8] and violation of the False Claims Act[9] against numerous defendants including

---

[7] The complaint alleges that in some instances, "[d]efendants used a 'Standard Freddie Mac/Fannie Mae Deed of Trust,' which prohibited [d]efendants from charging a reconveyance fee."

[8] The amended complaint alleged in part that "[d]efendants demanded, received, and retained reconveyance fees and failed to perform certain reconveyances, in breach of their contract with the home owners as set forth in the Deeds of Trust."

[9] The amended complaint alleged in part that "[d]efendants' submission to the State of forms listing abandoned property that omitted millions of dollars of unlawfully demanded or

the three respondents herein—defendants Bank of America Corporation, Union Bank of California, and Downey Savings and Loan Association (sued as Downey Savings Bank).

In addition to costs, attorney fees, and a civil penalty of $10,000 for each false claim violation, plaintiff seeks to recover the following amounts for himself and the State of California: (1) from defendant Bank of America Corporation—compensatory damages of $5,538,000 plus interest and treble damages in excess of $16,614,000; (2) from defendant Bank of America Corporation as successor in interest to Security Pacific Bank—compensatory damages of $4,524,000 plus interest and treble damages in excess of $13,572,000; (3) from defendant Union Bank of California—compensatory damages of $1,404,000 plus interest and treble damages of $4,212,000; and (4) from defendant Downey Savings Bank—compensatory damages of $1,014,000 plus interest and treble damages of $3,042,000.

In sustaining defendants' demurrer to the amended master complaint, the trial court concluded that plaintiff, who is neither a party nor third party beneficiary to the promissory notes and deeds of trust, lacked standing to sue for breach of contract. Plaintiff does not dispute that ruling on appeal.

The second amended master complaint alleged that defendants' failures to list the reconveyance fees as escheated property between 1991 and September 1995 constituted reverse false claims violations. Defendants demurred to the second amended complaint on the ground that the disputed reconveyance fees are not escheatable property under the UPL because they do not represent liquidated or certain obligations.[10] Defendants stated below:

"California's Unclaimed Property Law, Code of Civil Procedure §§ 1500 et seq., allows the state to take custody of certain abandoned property and make use of that property until claimed by the owner. The law covers savings accounts, travelers' checks, certificates of deposit, and other types of intangible property which are commonly held by a third party, such as a bank, until the owner wishes to claim the balance thereof. All of these types of property are similar in that they represent a certain and liquidated debt owed by the holder (e.g., the bank) to the owner (e.g., the depositor). For example, a depositor may withdraw the balance of her savings account without any real dispute as to whether she is entitled to payment or the amount that the bank is required to pay.

retained reconveyance fees constitutes a false claim because those forms did not accurately reflect the amounts that Defendants were required to escheat to the State of California, all in violation of California Government Code [s]ections 12652 et seq." (Underscoring omitted.)

[10] Civil Code section 2941, subdivision (j), which created the statutory duty to refund reconveyance fees in certain instances, was enacted in 2001, after the alleged reverse false claims violations occurred in this case.

■ "Where an obligation is unliquidated and uncertain, it is not subject to the provisions of the Unclaimed Property Law (or, as often said, subject to 'escheat'). Thus, for instance, courts have held that a claim for insurance benefits is not escheatable where the claim is disputed by the insurer, and the amount owed is not fixed by contract or schedule. *See, e.g. Allstate Ins. Co. v. Eagerton* (Ala. 1981) 403 So.2d 172, 173–6. In such cases, there exists no clearly established property right which can be held in custody by the state. Until the parties' dispute is resolved, it is unclear how much money—if any—is owed. [¶] [Plaintiff's] complaint alleges that because Bank of America purportedly breached its contracts and failed to perform reconveyances, it therefore had an obligation to refund any reconveyance fees charged. However, the facts pled do not establish a certain and liquidated obligation to refund reconveyance fees to any particular person. Rather, at most, they would give some homeowners a cause of action for breach of contract and/or violation of the state reconveyance statute—causes of action which carry a range of potential damages should the homeowner sustain its burden of proof. These uncertain, unliquidated claims are not escheatable property under the California Unclaimed Property Law."

The trial court sustained the demurrer without leave to amend and entered a judgment of dismissal. This appeal followed.

## DISCUSSION

■ "In examining the sufficiency of the complaint, '[w]e treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citations.] '[W]e give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff.' [Citation.]" (*First Nationwide Savings v. Perry* (1992) 11 Cal.App.4th 1657, 1662 [15 Cal.Rptr.2d 173].)

■ "Ordinarily, a general demurrer should not be sustained unless the complaint liberally construed fails to state a cause of action on any theory. [Citations.] Material facts alleged in the complaint are treated as true for the purpose of ruling on the demurrer. [Citation.] Also taken as true are facts that may be implied or inferred from those expressly alleged. [Citation.] However,

contentions, deductions or conclusions of fact or law alleged in the complaint are not considered in judging its sufficiency. [Citation.] In short, the ruling on a demurrer determines a legal issue on the basis of assumed facts, i.e., all those material, issuable facts properly pleaded in the complaint, regardless of whether they ultimately prove to be true. The complaint will ordinarily be upheld even though the facts are not clearly stated, or are intermingled with a statement of irrelevant facts. [Citations.]" (*Kiseskey v. Carpenters' Trust for So. California* (1983) 144 Cal.App.3d 222, 228 [192 Cal.Rptr. 492].)

## I

## FOR REVERSE FALSE CLAIMS LIABILITY TO ATTACH, THE OBLIGATION MUST BE CERTAIN AND LIQUIDATED

█ Under the FCA, liability for reverse false claims attaches when any person knowingly files a false record to conceal an obligation to pay money. The statute prohibits "[k]nowingly mak[ing], us[ing], or caus[ing] to be made or used a false record or statement to conceal, avoid, or decrease an *obligation* to pay or transmit money or property to the state or to any political subdivision." (Gov. Code, § 12651, subd. (a)(7), italics added.) The same prohibition exists under the federal False Claims Act (31 U.S.C. § 3729(a)(7)).

█ "Obligation," as used in the FCA, has been construed to mean a legal obligation in existence at the time the alleged false record was filed. "The obligation cannot be merely a potential liability: instead, in order to be subject to the penalties of the False Claims Act, a defendant must have had a present duty to pay money or property that was created by a statute, regulation, contract, judgment, or acknowledgment of indebtedness. The duty, in other words, must have been an obligation in the nature of those that gave rise to actions of debt at common law for money or things owed. This interpretation of the term 'obligation' is supported by the legislative history of the reverse false claims provision, which refers twice to 'money owed,' S.Rep. No. 99-345, at 15, 18, *reprinted in* 1986 *U.S.C.C.A.N.,* at 5280, 5283, as the kind of duty that the reverse claims provision is designed to address. The deliberate use of the certain, indicative, past tense suggests that Congress intended the reverse false claims provision to apply only to existing legal duties to pay or deliver property. Had Congress wished to cover attempts to avoid potential fines or sanctions it would have used language appropriate to that end. *Cf. United States ex rel. S. Prawer & Co. v. Verrill & Dana,* 946 F.Supp. 87, 93–95 (D. Me. 1996)." (*U.S. v. Q Int'l Courier, Inc.* (8th Cir. 1997) 131 F.3d 770, 773.)[11]

---

[11] Federal decisions are persuasive on the meaning of the FCA. (*Laraway v. Sutro & Co., Inc.* (2002) 96 Cal.App.4th 266, 275 [116 Cal.Rptr.2d 823].)

 In order to recover for reverse false claim violations, plaintiff must show that between 1991 and September 1995 (the interval during which defendants filed the allegedly false reports of escheated property), defendants owed a specific legal obligation to refund the reconveyance fees at issue in this case. Civil Code section 2941, subdivision (j), the reconveyance fee refund statute, was not enacted until 2001. In order to meet the burden of showing there was an obligation to refund the reconveyance fees between 1991 and September 1995, plaintiff must demonstrate that defendants' obligation was "sufficiently certain to give rise to an action of debt at common law. Whatever its scope, the False Claims Act clearly encompasses specific and legal duties to pay or transmit money or property to the government. *A defendant risks liability when making a false statement to conceal, avoid or decrease obligations such as his prior acknowledgment of indebtedness, a final court or administrative judgment that the defendant owes money or property to the government, or a contractual duty to pay or transmit money or property to the government.* [¶] Our review of the statute's text, legislative history, and most reasonable interpretation leads us to this conclusion." (*American Textile Mfrs. Institute, Inc. v. The Limited, Inc.* (6th Cir. 1999) 190 F.3d 729, 736, italics added.)

Other courts have held that reverse false claims liability "does not cover 'possible indeterminate future . . . liabilit[y].' . . ." (*American Textile Mfrs. Institute, Inc. v. The Limited, Inc., supra,* 190 F.3d at p. 735, citing *United States ex rel. S. Prawer & Co. v. Verrill & Dana* (D.Me. 1997) 962 F.Supp. 206, 209 ["Whether an obligation would exist depends on the outcome of litigation pursuing the alleged statutory violation."].)

 " '[T]he False Claims Act creates substantial financial incentives for private "whistleblowers" to help uncover and prosecute fraudulent claims made to the government. In an attempt to curb "opportunistic" or "parasitic" actions, however, it also includes a number of provisions that limit the circumstances in which a private person may bring or prosecute a qui tam action.' [Citation.]" (*Laraway v. Sutro & Co., Inc., supra,* 96 Cal.App.4th at p. 274, quoting *Rothschild v. Tyco Internat. (U.S.), Inc.* (2000) 83 Cal.App.4th 488, 495 [99 Cal.Rptr.2d 721].)[12]

---

[12] The qui tam plaintiff's recovery, where the state does not intervene, can range between 25 and 50 percent of the recovery: "If the state or political subdivision does not proceed with an action under subdivision (c), the qui tam plaintiff shall, subject to paragraphs (4) and (5), receive an amount that the court decides is reasonable for collecting the civil penalty and damages on behalf of the government. The amount shall be not less than 25 percent and not

Absent a requirement that obligations must be liquidated and certain, there would "be no way to define the scope of [reverse false claim] cases, which would seem to be as broad as any lawyer's creative impulses in defining a possible claim in the first place." (*United States ex rel. S. Prawer & Co. v. Verrill & Dana* (D.Me. 1996) 946 F.Supp. 87, 95, fn. 13.)

## II

## DEFENDANTS' OBLIGATION TO REFUND THE RECONVEYANCE FEES WAS NEITHER LIQUIDATED NOR CERTAIN

Plaintiff does not challenge the concept that obligations must be liquidated and certain in order for reverse false claims liability to attach. Plaintiff's disagreement is with the trial court's legal conclusion that defendants' obligation to refund the reconveyance fees was neither certain nor liquidated.

Plaintiff contends that because he seeks only the "disgorgement of a sum certain, namely, the amount of the reconveyance fee improperly charged or improperly retained," defendants' obligation is liquidated and certain. Plaintiff contends that whether analyzed as a breach of contract or a violation of Civil Code section 2941, defendants were obligated to "disgorge[] . . . the unclaimed or abandoned property [the reconveyance fees] . . . plus interest." According to plaintiff, "[t]he amount of the reconveyance fee is readily ascertainable by reference to the loan payoff documents."

Defendants, on the other hand, respond that whether their obligation was created by a breach of contract or a violation of statute, they would not, in either case, be required to disgorge the reconveyance fees (plus interest) without an enforceable agreement or judgment requiring them to do so. There is no allegation that any of the contracts provided for the specific remedy of disgorgement of the reconveyance fees, or that any judgment was entered to that effect. The absence of such allegations is fatal to plaintiff's claim. As one court aptly put it, "I may breach a contract, but absent a specific remedy provided in the contract, I have no obligation to pay or transmit money. . . . Money is not 'owed' without a specific contract remedy, a judgment or an acknowledgment of indebtedness." (*United States ex rel. S. Prawer & Co. v. Verrill & Dana, supra,* 946 F.Supp. at p. 94.)

Civil Code section 2941, subdivision (j), which was enacted in 2001, does not assist plaintiff (assuming it applies to disputes over matters predating

---

more than 50 percent of the proceeds of the action or settlement and shall be paid out of these proceeds." (Gov. Code, § 12652, subd. (g)(3).)

subdivision (j)'s enactment). Under subdivision (j) of Civil Code section 2941, if the lender collects a reconveyance fee but later has knowledge (or should have knowledge) that no reconveyance was recorded, the lender shall either: (1) cause the reconveyance to be recorded; or (2) refund the reconveyance fee to the borrower if a timely release of obligation was earlier recorded by the title insurance company.

The alternative method of clearing title by allowing the title insurer to record a release of obligation is available *only if* "the lender/beneficiary and trustee have both failed to issue a reconveyance despite the opportunity to do so." (*Trustors Security Service v. Title Recon Tracking Service, supra,* 49 Cal.App.4th at pp. 601–602.) As the lender must issue a refund only when the lender has knowledge that a release of obligation was earlier and timely recorded by a title insurance company, it must follow that no refund is required unless the lender "failed to issue a reconveyance despite the opportunity to do so." (*Ibid.*) In other words, Civil Code section 2941, subdivision (j)'s refund requirement only applies if the lender had an opportunity but failed to issue a reconveyance *before* the title insurer recorded the timely release of obligation. Where the lender had no such opportunity, the lender is not required to issue a refund.

As defendants point out, "[i]n order to prove that [defendants] knowingly retained reconveyance fees that [they were] required to refund, [plaintiff] would have to show not only that there existed a duty to refund reconveyance fees between 1991 and 1995 [which was before the enactment of Civil Code section 2941, subdivision (j)], and that [defendants were] aware of such a duty, but also that [defendants] knowingly failed to comply with the requirements of the reconveyance statute as they existed at that time, i.e., that [defendants] failed to deliver the necessary documents to the trustee within the required time period. The state of the law during that time frame makes this a virtual impossibility." (Fn. omitted.) Before the 2001 amendment to Civil Code section 2941, subdivision (b)(1) of that section set no time limit within which the lender was to deliver the necessary documents to the trustee for reconveyance.

Accordingly, we conclude that defendants' contractual breaches or statutory violations—the charging of improper reconveyance fees or the failure to record reconveyances—would not, without more, create a liquidated and certain obligation to refund the reconveyance fees.

## III

## FURTHER DISCOVERY WILL NOT ASSIST PLAINTIFF

Plaintiff seeks leave to conduct discovery to determine "whether the banks treated the reconveyance fees as a liquidated and certain obligation." Plaintiff states that "courts do not simply accept a financial institution's assertion that certain funds are unliquidated obligations. [¶] Treating as dispositive a financial institution's self-serving assertion that certain obligations are unliquidated would defeat the purpose of the Unclaimed Property Law. Instead, courts typically allow development of a factual record on the issue whether unclaimed funds are a liquidated obligation. In determining whether the obligation at issue was liquidated, courts examine, among other things, the terms of the contract giving rise to the obligation, and how the financial institution characterized and treated the funds at issue prior to commencement of litigation to escheat the disputed funds."

While a defendant's "prior acknowledgment of indebtedness" would constitute evidence of an obligation to pay money (see *American Textile Mfrs. Institute, Inc. v. The Limited, Inc.*, *supra*, 190 F.3d at p. 736 ["A defendant risks liability when making a false statement to conceal, avoid or decrease obligations such as his *prior acknowledgment of indebtedness*" (italics added)]), there was no indication of such an acknowledgement of indebtedness in this case. On the contrary, the complaint alleged that "[d]efendants made *no* effort to return these reconveyance fees to the home owners." (Italics added.) Given that defendants made no effort to return the reconveyance fees, from which we reasonably infer there was no acknowledgment of indebtedness, it was incumbent on plaintiff to offer some explanation as to why further discovery would lead to evidence that there was an acknowledgement of indebtedness. Plaintiff may not overturn a demurrer ruling by simply contradicting the allegations in his original complaint without offering an explanation for the discrepancy. (See *Owens v. Kings Supermarket* (1988) 198 Cal.App.3d 379, 384 [243 Cal.Rptr. 627].)

We distinguish the cases cited by plaintiff in which insurance defendants, after issuing checks to claimants, disputed whether those checks which were not cashed constituted acknowledgements of indebtedness and were subject to escheat.[13] In this case, as defendants made no attempt to make any payments or refunds, there is no factual basis to support an inference of an acknowledgment of indebtedness.

---

[13] See, for example, *Blue Cross of Northern California v. Cory* (1981) 120 Cal.App.3d 723 [174 Cal.Rptr. 901]; *Revenue Cabinet v. Blue Cross and Blue Shield of Kentucky* (Ky. 1986) 702 S.W.2d 433; and *Attorney General v. Blue Cross and Blue Shield of Michigan* 168 Mich.App. 372 [424 N.W.2d 54].

As we discussed above, in order for plaintiff to show that defendants were obligated to refund the reconveyance fees under Civil Code section 2941, subdivision (j) (assuming subdivision (j) applies to this case), plaintiff must show that defendants had an opportunity to issue a reconveyance *before* the title insurer recorded the timely release of obligation, but failed to do so. Even when the trustee fails to issue a reconveyance within 60 calendar days of the satisfaction of the note, the lender has no obligation to substitute itself or another as trustee and issue a full reconveyance until the lender receives a written request from the borrower. (Civ. Code, § 2941, subd. (b)(2).) There are no allegations in the complaint that defendants received or ignored such written requests. The complaint fails to explain when and how defendants had the opportunity but failed to issue a reconveyance before the title insurer recorded a timely release of obligation.

Defendants state in their brief that "[f]urther discovery will do nothing to save [plaintiff's] allegations. [Plaintiff] admits that at the time he filed these lawsuits in 1999, he possessed—and had reviewed—300 boxes of loan files, containing *several thousand* deeds of trust."

Given the state of the pleadings, the lack of any explanation of defendants' alleged failure to comply with Civil Code section 2941, subdivision (j), and the absence of any individual with standing to sue for a breach of contract or violation of Civil Code section 2941, subdivision (j), we agree with defendants that further discovery will not assist plaintiffs to state a cause of action.

IV

STATUTE OF LIMITATIONS

Plaintiff contends the trial court erred in sustaining the demurrer on the basis that plaintiff's claims would be barred by the statute of limitations if brought as a private cause of action. Plaintiff points out that claims under the UPL are not subject to statutes of limitation. (Code Civ. Proc., § 1570.)

As this rationale was not necessary to the court's ruling, the issue merits no further discussion.

V

CONCLUSION

In this case, plaintiff not only lacked standing to pursue a breach of contract claim or a class action to recover the disputed reconveyance fees, he

sought to use the UPL as the hook for imposing reverse false claims liability for violations that are not even punishable under the UPL unless the violator is given notice and an opportunity to correct the alleged violations. Despite the lack of any allegation that defendants received such notice from the Controller, plaintiff contends defendants' obligation to refund the reconveyance fees was both liquidated and certain because plaintiff is seeking only the disgorgement of the reconveyance fees. Plaintiff's waiver of other damages, however, fails to establish that an enforceable obligation to refund the fees existed when the allegedly false reports were filed.

We conclude the demurrer was properly sustained without leave to amend for failure to state a cause of action.

## DISPOSITION

We affirm the judgment (order of dismissal). Defendants are awarded their costs on appeal.

Spencer, P. J., and Mallano, J., concurred.

A petition for a rehearing was denied February 24, 2005, and appellant's petition for review by the Supreme Court was denied May 18, 2005. Chin, J., did not participate therein.